993 P.2d 25 (2000)
John Francis MAZZAN, Appellant,
v.
WARDEN, ELY STATE PRISON, E.K. McDaniel, Respondent.
No. 30998.
Supreme Court of Nevada.
January 27, 2000.
*27 JoNell Thomas, Las Vegas, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City, Richard A. Gammick, District Attorney, and Gary H. Hatlestad, Chief Appellate Deputy District Attorney, Washoe County, for Respondent.
BEFORE THE COURT EN BANC.

OPINION
PER CURIAM:
In 1979, appellant John Francis Mazzan was convicted of first-degree murder and sentenced to death in the Second Judicial District Court. The state's theory was that he stabbed Richard Minor to death in Minor's home and then took money and drugs from the home. On appeal, this court affirmed Mazzan's conviction but reversed his sentence. Mazzan v. State (Mazzan I), 100 Nev. 74, 675 P.2d 409 (1984). After a second penalty hearing, Mazzan again received the death penalty, and this court affirmed that sentence on the second appeal. Mazzan v. State (Mazzan II), 103 Nev. 69, 733 P.2d 850 (1987). Mazzan petitioned for post-conviction relief, the petition was denied, and this court affirmed the denial. Mazzan v. State (Mazzan III), 105 Nev. 745, 783 P.2d 430 (1989).
Mazzan next petitioned for post-conviction habeas relief. After the First Judicial District Court summarily denied the petition, Mazzan appealed, and this court remanded the matter for reconsideration. After being transferred to Ely State Prison, Mazzan moved for a change of venue to the Seventh Judicial District Court. The district court denied the motion; this court dismissed Mazzan's interlocutory appeal of the denial without reaching the merits. Mazzan v. State (Mazzan IV), 109 Nev. 1067, 863 P.2d 1035 (1993).
The district court then dismissed the habeas petition as procedurally barred. This court affirmed. Mazzan v. State (Mazzan V), 112 Nev. 838, 921 P.2d 920 (1996). Mazzan petitioned for rehearing, asserting that he had discovered that the state had withheld exculpatory police reports from him before his trial. This court denied rehearing, concluding that his remedy was to file another habeas petition in the district court. Mazzan v. State, 112 Nev. 838, 921 P.2d 920 (1996) (Order Denying Rehearing, November 8, 1996). Mazzan did so.
After an evidentiary hearing, the district court entered an order denying the habeas petition. The court concluded that although the police reports were material and exculpatory and were probably not provided to Mazzan, prosecutors had orally communicated to his defense counsel any information required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court's order did not address other claims Mazzan had raised in his petition. Mazzan appeals.

FACTS

Facts disclosed at earlier proceedings
Mazzan testified at trial to the following. He moved to Reno in April 1978 and worked as a hairdresser while his wife worked in Las Vegas as a dancer. Mazzan and his friends used marijuana and cocaine, and he obtained cocaine from April Barber, a prostitute at Mustang Ranch. He became friends with Barber's boyfriend, Richard Minor, who supplied him with marijuana.
Mazzan spent the evening of Wednesday, December 20, 1978, at Minor's residence. The two smoked marijuana, snorted cocaine, and taped albums. Sometime in the early morning, Mazzan tried to leave, but his car would not start. Minor let him spend the night, and he bedded down behind Minor's couch and slept. Mazzan awoke to the sound of a scuffle in the kitchen and saw Minor struggling with someone. The person left through the door, and Mazzan heard two people running and then a car driving away. Minor had blood all over him. Mazzan was confused and shocked; he stepped out the door, could not see anything, and went back inside. Minor was leaning against the wall and then collapsed and died. Mazzan left and did not report the crime because he was afraid that he would be implicated in the *28 drug use and might be in danger from the perpetrators of the crime if they found out he knew anything. He was sure Minor was already dead, and he expected that Minor's younger brother would arrive that morning and discover Minor. When Mazzan returned home, he cleaned his shoes and washed his hands. He had his clothes laundered. When police later questioned him, he told them he had thrown away a pair of running shoes about a month earlier. The state provided evidence that that same type of running shoe had a pattern resembling bloody footprints in the kitchen at the crime scene.
Minor's father, a justice of the peace, discovered his son's body on Friday, December 22, 1978, the day after the killing. On Wednesday he had gone to his son's residence. Mazzan was present, and Minor had introduced him as "my friend Jack." (Mazzan was called both John and Jack.) Minor's younger brother also saw Mazzan at the residence Wednesday evening. He had met Mazzan a few times before, and Minor and Mazzan appeared to be friends. A little past midnight that same night, John Sullivan saw Mazzan at Minor's. Sullivan bought a quarter ounce of Hawaiian marijuana from Minor for $65.00 and left.
Jim Shallman, a friend of Minor's, testified that Minor had traveled to Hawaii, evidently not long before his death, and returned with about two pounds of marijuana. Shallman saw Minor with $6,000.00 in cash in mid-October 1978. He had seen Mazzan with Minor a few times, and the two appeared to be friends.
At the crime scene, investigators found a blanket with several cuts in it and blood on it. The residence was small, a converted garage. An investigator theorized that Minor was first attacked with a knife while lying on the couch with the blanket over him and that he then went into the kitchen toward the door and refrigerator. Minor was found on the floor near the couch. Prints left in blood by a kind of sports shoe were found on the kitchen floor and the blanket; only one print was distinct. No identifiable fingerprints were found. Most of the blood was found in the kitchen and where the body was lying. A smear of blood was later found on the inside of the driver's side window of Mazzan's car.
Minor was stabbed fifteen times, including in the heart and lungs. There was no sign of forced entry to the residence. The prosecution theorized that he was killed for his money and drugs. However, other than the $65.00 received by Minor that night, there was no clear evidence of how much money or drugs Minor had the night he was killed.
Two days after the murder, Mazzan flew to Las Vegas to see his wife for the holidays. Las Vegas police contacted him, informed him he was a suspect in Minor's killing, and told him he should contact the police in Reno when he returned there. He volunteered no information about Minor's death.
Mazzan returned to Reno on December 26, 1978, and went to the police station the next morning around 11:30 a.m. He was questioned for about twelve hours and then arrested for murder. Mazzan first told the police that on the night in question, he had left Minor's place around midnight and did not see the murder. When told that blood had been found in his vehicle, Mazzan admitted that he had been present when Minor was killed. The police checked and found no apparent bruises on Mazzan. (Minor had been about six feet four inches tall and weighed about two hundred fifteen pounds.) Over the next few days, the police obtained a number of statements from Mazzan that showed some discrepancies, e.g., in regard to the position that he left Minor in, the shoes which he had worn at Minor's residence, and what he had done immediately after he left there. Mazzan's trial counsel, Larry McNabney, later stipulated to the voluntariness of these statements.
On January 3, 1979, a week after Mazzan's arrest, a garbage worker found a bloody coat belonging to Mazzan and a purse and bloody clothes belonging to April Barber, Minor's girlfriend, in a trash can not far from Mazzan's home. A key to a lock at Minor's residence was in Barber's purse. Barber had been missing for about a month. The evidence showed that these items were placed in the trash after Mazzan had been arrested and incarcerated. On February 13, *29 1979, the state filed an amended information alleging that Mazzan either murdered Minor or aided and abetted in his murder.
During trial, as the state prepared to rest, District Attorney Cal Dunlap moved to block any inquiry by the defense into either the police investigation of Minor's drug connections or a statement by Minor's sister. The sister had informed police that Minor had told her not long before his death that he was in danger due to his drug dealings. Dunlap argued that it was all inadmissible hearsay evidence. McNabney countered that the defense case depended on showing that after Mazzan was in custody, the police went to Ohio, Indiana, and Hawaii and continued their investigation. The defense theory was that Minor was involved with drug traffickers who murdered him and left Mazzan "holding the bag. And, if we can't get into that, we might as well end the whole trial right here." The district court asked where Minor's sister was. McNabney said, "I don't know; I didn't even know about this sister's statement until I saw it in the police report today. I don't know where she is. That's the first I ever knew of it." The court considered the sister's statement admissible but concluded that "the fact that the police were following leads around the country" was not relevant. As a result, McNabney was not able to elicit any evidence other than that the police had investigated in the Midwest after Mazzan was in custody.
After the court's ruling, the state called Minor's sister, Cynthia Shelley, to testify. About two weeks before his death, Minor told her and her husband "that he was afraid, that he had been involved in some sort of dealing, and he wanted to get out, and he was afraid." On cross-examination, McNabney asked Shelley who her husband was and where he was. She told him, "He is outside the door." The state then called the husband, who testified that Minor "was concerned that his involvement with drugs had brought him to the point where he was in trouble with the police."
The state then rested. Mazzan testified in his own defense, as discussed above, and called several character witnesses who testified to his nonviolent nature. In closing argument, Dunlap dismissed the defense's suggestion that Minor was killed over some drug deal, telling the jury several times that police had uncovered no evidence of such a possibility.
The jury found Mazzan guilty of first-degree murder and sentenced him to death. McNabney filed a notice of appeal and withdrew as Mazzan's counsel. The district court appointed the Washoe County Public Defender (WCPD) to represent Mazzan on appeal.
In March 1981, about a year and a half after the verdict, Mazzan's new counsel, Patrick Flanagan, moved the district court for acquittal, on the basis of insufficient evidence, or for a new trial, based on newly discovered evidence that April Barber had been murdered. Barber's skeletal remains were found in November 1979 and indicated that, like Minor, she had been stabbed to death. Flanagan argued that Barber and Minor were murdered by the same persons, that Mazzan could not have murdered Barber, and thus that Mazzan had not murdered Minor.
In April 1981, Flanagan moved to inspect and copy any records the state had of Minor's drug dealings. At a hearing on the motion in May 1981, Flanagan argued that the identity of Minor's drug contacts was critical to determining who murdered Minor and Barber. Dunlap opposed the motion. He asserted that the matter of Minor's drug dealings "was thoroughly litigated and argued to the jury." He also asserted that the evidence regarding Minor's drug dealings contained nothing exculpatory. Dunlap told the district court that ordinarily he would not object to discovery of the material; however, if Mazzan's appeal in this case was successful, he intended to charge Mazzan with Barber's murder and therefore did not want to allow "a fishing expedition" through his files. Pursuant to the district court's request, Dunlap said that he would provide his entire file to the court for in camera review. In March 1982, at the start of the hearing on Mazzan's motions for acquittal or a new trial, the district court announced that it had considered a series of police reports provided by Dunlap and found nothing exculpatory.
*30 During the hearing on Mazzan's motions, Reno Police Department Detective Teglia testified. Flanagan asked Teglia if during his Midwest investigation he had developed any suspects that might have been involved in Minor's murder. Teglia replied, "No." The court denied the motions. The court stated that although it had thought Mazzan was innocent, it did not feel the evidence justified advising the jury to acquit. It concluded that the new evidence of Barber's remains did not exculpate Mazzan.
On appeal, this court affirmed Mazzan's conviction; however, it reversed the sentence because of ineffective assistance of counsel at the penalty hearing. Mazzan I, 100 Nev. 74, 675 P.2d 409.
The second penalty hearing occurred in February 1985. McNabney again represented Mazzan. The jury returned a verdict of death, finding the murder occurred in the course of burglary and robbery. McNabney filed a notice of appeal and a motion to withdraw as counsel. The district court again appointed the WCPD to represent Mazzan on appeal. This court affirmed the death sentence. Mazzan II, 103 Nev. 69, 733 P.2d 850.
Mazzan filed a petition for post-conviction relief in May 1987. In December 1987, the district court dismissed it, and on appeal, this court affirmed. Mazzan III, 105 Nev. 745, 783 P.2d 430.
In June 1988, Mazzan filed for post-conviction habeas relief. After the district court summarily denied relief, this court remanded to allow Mazzan an opportunity to show cause for his failure to raise his claims earlier. In February 1995, the district court again denied the petition. This court affirmed in 1996. Mazzan V, 112 Nev. 838, 921 P.2d 920.
Mazzan petitioned for rehearing, asserting that he had discovered that the state had withheld exculpatory information from him before his trial. In denying rehearing, this court stated:
If appellant's allegations are true, then it appears that appellant is entitled to a new trial. Appellant's allegations require factual determinations which are best addressed in the district court. If true, appellant's claim that the state withheld exculpatory police reports demonstrates good cause and prejudice to excuse a procedural bar to the filing of a new petition for a writ of habeas corpus. We conclude that appellant's remedy is to now file a petition for a writ of habeas corpus in the Second Judicial District Court.
Mazzan v. State, 112 Nev. 838, 921 P.2d 920 (Order Denying Rehearing, November 8, 1996) (citations omitted).

Facts disclosed after the filing of the instant petition
Mazzan filed his instant petition seeking habeas relief in the district court in November 1996 and a supplement to his petition in May 1997. Mazzan's primary claim, briefly put, was the following. Upon receiving the police file on his case in 1996, he discovered that after Minor was murdered, police investigators uncovered information that Minor had been dealing drugs with Harry Douglas Warmbier and Mark Siffin. Minor had grown up with Warmbier in the Midwest. Warmbier and Siffin did extensive drug trafficking and were under investigation by the Drug Enforcement Agency (DEA) at the time. Warmbier was enrolled at Indiana University but had actually hired an associate, Robert Carmichael, to impersonate him and attend classes for him. There was evidence that Warmbier and Siffin might have been in Reno at the time of Minor's murder. Through his attorney, Warmbier claimed to have an alibi and refused to be interviewed by Reno detectives. Siffin could not be contacted at all because he had dropped out of sight since the time of Minor's murder. Mills Lane, the initial prosecutor in this case, asked Warmbier's attorney to send documentation to back up the alibi. The documents sent in response were of questionable reliability, including unsworn statements by Warmbier's girlfriend, Dorothy Nyland, and by Carmichael's girlfriend. Carmichael not only impersonated Warmbier at college but was linked to Warmbier's drug activities. The following sets forth in more detail the information which the prosecution possessed.
*31 Reno Police Detectives Teglia and Penegor were the lead investigators in the Minor homicide. A report by Penegor in January 1979 included the following information. Three days after the murder, Penegor telephoned Nola Minor, the victim's mother, in Ohio. She stated that Minor had called her on November 26, 1978 (about four weeks before his murder), from San Francisco. He told her that he was with two other people, apparently Doug Warmbier and a Mark whose last name she did not know. She knew that "Doug and Mark had come to Reno," and the three had driven to San Francisco in Minor's van. The report noted, "Mark could be a Mark Siffin." Nola Minor also received a call from Minor on December 2, 1978. He was in Hawaii, apparently with Warmbier and Mark. On December 8, 1978, she called and spoke to her son in Reno. According to the report, he told her that after he returned to Reno, April Barber
had left him and was not at the residence. He was concerned because she had a car and a door key to his residence. Upon returning to the residence he found a burnt $20 bill that April had left for him, unknown what significance this was at this time.
Nola Minor later learned from Tim Beck, a friend of her son's and Warmbier's, that Warmbier was supposed to be in the Reno area on December 20 or 21, 1978, to contact her son. (The murder occurred early in the morning on Thursday, December 21, 1978.)
Warmbier was enrolled at Indiana University (IU). Reno police asked IU police to contact Warmbier and received an IU police officer's report with the following information. On January 18, 1979, the officer tried to interview Warmbier and discovered that a person was impersonating Warmbier. The person identified himself as Robert Carmichael, admitted that he was paid to attend classes for Warmbier, and telephoned Warmbier's attorney, Ira Zinman. The next day the officer met with Zinman, Warmbier, and Nyland, Warmbier's girlfriend. Warmbier admitted that he knew Minor but tried "to give the impression that they were not good friends." Warmbier stated that he had learned of Minor's death on the morning of December 22, 1978, when Nyland called Minor's residence and police answered. Warmbier also stated that he last visited Reno about three weeks before Christmas, and he and Minor flew from San Francisco to Hawaii. Minor had just broken up with Barber, whom Minor described "as a hooker, prostitute, and extortionist." Warmbier said that he knew several people named Mark, but only he and Minor had gone to Hawaii. Warmbier said that he was in Bloomington, Indiana, from December 8 until just before Christmas 1978.
Police in Reno also obtained DEA investigative reports. One report covered suspected drug smuggling and trafficking in Bloomington, Indiana, in July 1978. Among other things, it noted suspicious activities by Siffin and Carmichael at an airport, carrying items to and from an airplane, and vehicular traffic between Siffin's residence and that of Nyland and Warmbier. Another DEA report stated that "Siffin is suspected of being a major cocaine trafficker."
Reno Police Detective Captain Ken Pulver spoke to reporters on January 25, 1979. The Nevada State Journal reported that Pulver said drug trafficking was a factor in Minor's murder and he would "send officers to San Francisco, Ohio, Indiana and perhaps Hawaii to interview persons on the unsolved crime." The Reno Evening Gazette carried a similar article. The next day, prosecutor Mills Lane addressed a letter to Capt. Pulver, stating:
[T]he Mazzan case is a tough one at best. We're going to use all the facts and investigation to our best advantage, of course, keeping sound ethics and good police conduct in mind. I do not want any of our investigation or any of the facts that we have develop[e]d released to the press unless the same is discussed with me. The more the defense knows about our case, the more they are going to be able to try and work around it. In Nevada we do not have to give out police reports, and if the press knows what's in those reports it's the same as turning them over to the defense.
Reno Police Sergeant Rodney Stock, who was an initial investigator of the murder, submitted a report on February 5, 1979, noting among other things the following. "In *32 the original investigation it was learned that Harry Douglas Warmbier and a man named Mark were coming to Reno someti[me] around the twenty-first or twenty-second of December to meet [Minor] and possibly go on to Hawaii." "Mark Siffin apparently went underground sometime prior to the Christmas holidays and has not been seen since according to the Monroe County [Indiana] Sheriff's Department, IU Police, and apparently the DEA Task Force working this particular case."
On February 2, 1979, after Mazzan had been in custody for more than five weeks, an interoffice memo by Det. Teglia stated that investigators had information
which indicates that there is a direct connection between Minor's death and certain persons/activities in the Midwest.
Certain of Minor's activities immediately prior to his death have involved people from the Cincinnati and Bloomington, Ind. area. Also, numerous phone calls made by Minor to associates in these two cities and in adjacent areas seem to lend credence to information received from DEA that Minor and his associates were in fact involved in a major narcotics distribution ring.
It is believed that Minor's death, and the presumed death of April Barber are directly connected to these narcotics activities. It is also believed that direct contact with the other persons believed to be involved will provide information which will assist in establishing motive, and information vital to the prosecution.
About a week later, Dets. Teglia and Penegor traveled to the Midwest to investigate leads there.
The detectives interviewed Michele Cameron Abshire in Ohio, who told them that she and Minor had known each other for about seven years and at one time planned on marrying. Minor had worked for Warmbier, transporting marijuana. Minor dealt in only small amounts on consignment. A month or two before his death, Minor told Abshire that he and April Barber, who had money, planned to make cash deals. Once Mark Siffin "had slipped some cocaine on" Minor without his knowing, and Minor "was highly upset because of it." Abshire heard, apparently from Warmbier, Tim Beck, and Glenn Peterson (a Reno friend of Minor's), that Warmbier and someone else were supposed to meet Minor in Reno on Thursday (the day of the murder), but Minor failed to meet them at the airport; they may have gone to Minor's residence, found his body, and left. Abshire suspected that Barber and Minor were killed because Barber was extorting money from someone. (Barber was missing at the time; her body was discovered later.)
Another police report shows that the detectives also contacted Warmbier's attorney, Zinman, in Indiana and asked to interview Warmbier. Zinman would not allow an interview but suggested a polygraph examination based on questions made up by Zinman. This was unacceptable to the detectives. They telephoned Warmbier, but he refused to be interviewed.
Another report summarizes the detectives' interview in Ohio of Tim Beck, Minor's friend since childhood. The day before the murder, Minor telephoned and told Beck that after Minor had returned from Hawaii in early December, he found that Barber was gone from his residence but her clothing and personal belongings were still there. Minor also found a burnt twenty-dollar bill, the significance of which he did not understand. After the murder, Warmbier told Beck that Warmbier flew into Reno early on Thursday, December 21, 1978. Minor failed to pick Warmbier up at the airport so Warmbier took a taxi and arrived at Minor's after police had discovered the body. The report states that Warmbier may have been accompanied by Mark Siffin. It also notes that police did not discover Minor's body until December 22, 1978, not December 21 as Warmbier said to Beck. Also, the time that Warmbier said he arrived in Reno did not correspond to flight schedules from the east, but could correspond to flights out of San Francisco or central California.
Meanwhile, investigators in Reno interviewed Glenn Peterson, a friend of Minor's. Peterson said that Minor had talked about his drug connections from "back east" but never mentioned names. Minor intended to meet "the boys from back east" on Thursday, December 21 (the day of the murder) about *33 the purchase of Thai sticks (a potent form of marijuana). Either they would come to Reno, or Minor would go to San Francisco. Minor was close to April Barber, but Peterson had "bad vibes" about her. She had a lot of money and cocaine, and Minor "seemed to change after he met" her and "seemed on edge after she left."
James Shallman, who had worked with Minor, was also interviewed in Reno. Shallman told an investigator that Minor had said he had a big shipment of Thai sticks coming in and that he
was leaving Wednesday, Thursday or Friday driving the van, and "this guy" was coming out or already here. This "guy" supposedly knew how to handle Hawaiian agricultural inspections by switching suitcases. Richard Minor had stated that he had been "burned" by this guy but "respected him" and thought that he was an "asshole."
....
[M]ost of the money Richard Minor had belonged to "the guy." [Shallman] then used the phrase "Mr. Big" stating that this "Mr. Big" had made lots of money traffic[k]ing narcotics.... Minor said cops in Bloomington [Indiana] had come down hard and affected "Mr. Big".
During the fall of 1978, Minor apparently owed this person about $6,000.00 for fronting drugs to him; Shallman did not know if or when Minor had paid the debt. Investigators also learned that Minor had told his sister, Patti Ison, about a debt. Sometime after Minor's death, Ison wrote her father that "[f]ive or six months ago he [Minor] asked me if I could loan him some money, he owed it to someone and had to pay them back."
On February 22, 1979, after returning from the Midwest, Dets. Teglia and Penegor wrote an interoffice memo to their captain. They stated that they had gathered information that Warmbier was in Reno around the time Minor's body was discovered, that Minor was heavily involved in drug trafficking, and that "direct contact with Mr. Warmbier was of extreme importance in resolving this portion of the investigation." They detailed how Warmbier and his attorney had prevented such contact. Since they "did not have enough information to formally charge Mr. Warmbier as a princip[al] or accessory" in the murder, "this aspect of the investigation could not be pursued any further." They advised DEA and Indiana investigators of the situation, and one investigator indicated that he would continue to investigate Warmbier and Siffin to try to obtain information useful to the murder investigation. Teglia and Penegor stated that earlier the investigation "had reached a complete standstill," but on their Midwest trip "a number of new areas were opened up which are assisting investigators in establishing a more viable case for the prosecution."
The same day that the detectives reported how Warmbier's attorney, Zinman, had "thwarted" their efforts to contact Warmbier, prosecutor Mills Lane wrote Zinman to thank him for "agreeing to furnish us with certain information to alibi your client, Mr. Warmbier." Two months later, on May 1, 1979, Zinman wrote to Lane and sent him two receipts and two handwritten letters. A letter by Dorothy Nyland stated that she was with Warmbier in Bloomington, Indiana, on "the 20th and 21st" and that she had verified this with shopping receipts. Debra Russell's letter stated that Warmbier had borrowed the car of her roommate, "R. Carmichael," on December 20 and returned it about 6:30 that evening. It appears that Lane did not know that Nyland was Warmbier's girlfriend or that Robert Carmichael was the person that Warmbier paid to impersonate him at Indiana University. In a letter dated May 4, 1979, Lane told Zinman that defense counsel McNabney "has advised me that he would not contest the fact that your client was in Bloomington if I could provide documentation to that." Because of the documents provided by Zinman, Lane did not believe that he would need to subpoena anyone regarding Warmbier's alibi.
On February 14, 1979, Mazzan's trial counsel, McNabney, had moved for discovery of any material which the state knew or might learn of "which is exculpatory in nature or favorable to the accused or which may lead to exculpatory material." In March 1979, he moved for discovery of the state's witnesses' *34 statements. Lane opposed the motion, and it was denied. Mazzan was tried and convicted in October 1979.
Almost seventeen years later, in July 1996, Michael Hodge, an investigator for the Nevada State Public Defender, subpoenaed the police file in Mazzan's case. The Reno City Attorney's Office eventually approved release of the file, containing 500 to 700 documents, but Hodge was told that he would not receive any confidential reports; to obtain those, he had to contact the District Attorney's Office. Nevertheless, Hodge's inspection of the file uncovered the police reports discussed above, some of them marked confidential.
After Mazzan filed his instant petition for habeas relief, he moved the district court to bifurcate the issues raised in the petition, to consider first his claim that he was not provided with exculpatory evidence and, if necessary, to consider his other claims later. The state did not object.
During a deposition in May 1997, former police sergeant Stock testified as follows. Stock was a supervisor in the detective division of the Reno Police Department and worked on the investigation of Minor's murder for about three weeks in early 1979. He believed that the investigation had not eliminated all possible suspects. Teglia's and Penegor's investigation of Warmbier and Siffin as suspects in Minor's murder had been frustrated. "I still think to this day that somebody back there [in the Midwest] has withheld information." Mazzan could have been "in the wrong place at the wrong time." He also might have been an accessory, but "we may have more people involved in the actual murder." When the state asked if it was true that "the police department in Reno had a man in custody and simply left it at that," Stock replied, "Yeah. It's probably true. But then again, it's up to the District Attorney's Office, which the police have no control over." In a capital case, Stock felt that "you would have to follow up, do everything you could to attempt to find [someone like Warmbier] and interview him or whatever, try and get additional evidence like, say, a plane ticket or passenger list or whatever to verify if he was here or not." Stock thought the police "did as much as they could under the circumstances.... [Y]ou're talking time, manpower, and money."
On May 28 and 30, 1997, the district court held an evidentiary hearing, and a number of witnesses testified. Former detective Teglia testified that Warmbier was initially a suspect in Minor's murder, but eventually the investigation focused solely on Mazzan. Mazzan's counsel asked Teglia if he had "specific evidence that eliminated Mr. Warmbier and Mr. Siffin as suspects," and Teglia replied, "We had specific lack of evidence that allowed for the possibility of anybody else but Mr. Mazzan being in the residence at the time the homicide occurred." Evidence showed that other people were "involved after the fact," but this was not relevant to who committed the killing. The police never determined whether or not Warmbier or Siffin was in Reno around the time of the murder.
Mills Lane, the initial prosecutor, testified. Lane usually did not allow defense attorneys to look at his case file, and if he did not trust an attorney, he gave the attorney nothing more than was required by law. He did not copy reports for defense attorneys; he "would give a synopsis" of any Brady material. Lane remembered talking to McNabney about Warmbier, but McNabney said that he was not going to claim that Warmbier committed the murder. After that, Lane did not consider Warmbier "pertinent." He saw no nexus between Warmbier and the murder. When asked about the fact that "Warmbier may have been here in Reno on or about the day of the murder," Lane responded, "On or about doesn't do very much for me. If you say he was in Mr. Minor's house the night he was killed, that would be something different." Mazzan's counsel showed Lane the alibi documents, and Lane agreed that the two "Dorothy Nyland" signatures (one on a letter and the other on a receipt) slanted in different directions. He also conceded that it would "bother" him if he found out that Warmbier now admitted that he had been in Reno, contrary to the alibi. Lane was not sure if he told McNabney that the DEA was investigating Warmbier and Siffin. Lane did not remember information that Warmbier and a man named Mark were coming to Reno to meet Minor at the time of the murder, *35 but he was satisfied that he would have given such information to McNabney.
Cal Dunlap, the trial prosecutor, testified. Dunlap was not sure if he provided McNabney with an open file, and he did not recall giving any specific documents to McNabney. Whether he gave McNabney documents or just spoke with him, he knew that McNabney "knew a lot of that information that's in the [police reports]." McNabney "didn't seem the least bit interested in following up on these because ... he didn't believe that there was any real substance and any need to pursue these leads." When asked if he told McNabney that "at least one witness said that Mr. Warmbier was in town on the day of the murder," Dunlap answered that he had no specific recollection, but "[i]f I knew, I probably did." Dunlap answered similarly regarding whether he shared other specific facts. When Mazzan's post-trial attorney,[1] Patrick Flanagan, specifically requested any written reports on Minor's drug transactions, Dunlap claimed that he refused to provide the documents because he thought that Mazzan was involved in April Barber's murder and defense counsel simply wanted discovery for that case. Dunlap admitted that at trial he had been convinced that other people were involved in Minor's murder. Mazzan's counsel asked Dunlap how he could tell the jury at trial that no evidence supported Mazzan's defense when his file contained such evidence. Dunlap said that he simply based his argument on the record before the jury and that other evidence was not relevant.
Mazzan called as witnesses his trial attorney, McNabney; his trial investigator, Richard Terry Gilmartin; his post-trial attorney, Flanagan; his appellate attorney, Jane McKenna; and his post-conviction attorney, Don Evans. In representing Mazzan, none had seen any of the police reports at issue.
McNabney testified. Before trial, McNabney became aware through the District Attorney's Office that Warmbier was involved in drug trafficking with Minor.
[I]t was related to me that there may have been a possibility [Warmbier] was here in Reno ... on the day of the murder....
In discussions with the prosecutor at some point in time I was satisfied in my own mind that Douglas Warmbier's alibi was solid and he wasn't in fact in Reno, and I didn't pursue the matter further.
McNabney also telephoned Zinman, Warmbier's attorney, regarding the alibi. McNabney did not recall ever being told that one person had placed Warmbier in Reno around the time of the murder. This information would have been helpful to Mazzan's defense, but the representations McNabney received "indicated that [Warmbier] wasn't in fact here, that he had an alibi, and that's all I knew."
Flanagan testified. He initially represented Mazzan after his conviction and moved for a new trial. In April 1981, he moved to inspect and copy any records the state had of Minor's drug dealings. Dunlap opposed the motion and asserted that the evidence regarding Minor's drug dealings contained nothing exculpatory.
At the hearing, Mazzan also attempted to present evidence he had uncovered after obtaining the police reports. He offered it to show that the reports contained material information which could have led to further exculpatory information. The district court ruled that the evidence was not relevant because it had not been in the possession of the state. Testimony by Michael Hodge and an affidavit by Dean Taylor Brymer were therefore not considered by the court, but were submitted as offers of proof. According to Brymer's affidavit, in December 1978, less than two weeks before the murder, Brymer broke into Minor's residence and stole a large amount of marijuana and $6,000.00 in cash. Hodge, the investigator for the State Public Defender, provided an affidavit and notes. Hodge interviewed Dorothy Nyland in Indiana in April 1997. When shown the alibi letter over her name, Nyland did not remember writing it and did not think the signature was hers. Nyland said that Warmbier had called her from Reno on December 22, 1978, the day that Minor's body was discovered. Hodge also interviewed *36 Warmbier, who was in a hospital after a serious accident. Warmbier "admitted being in Reno on the day of the murder." He said that he and Minor had worked for Siffin, who had been the "brains and money" behind the drug operation. Minor stole some drugs from Siffin, but Warmbier did not know the quantity; Siffin was capable of killing Minor, but Warmbier "would have killed Siffin if he even thought" Siffin did it. Warmbier did not recall seeing or authorizing the alibi letters.
In response, the state submitted an affidavit by its own investigator. That affidavit stated in part that the investigator spoke to Warmbier, that Warmbier said he spoke to someone about Minor's murder while he was heavily medicated and did not recall what he said, and that Warmbier denied being in Reno at the time of the murder.
On August 18, 1997, the district court entered an order denying the habeas petition. The court concluded that although the police reports had exculpatory value and were probably not provided to Mazzan, prosecutors had told McNabney orally any information required by Brady. McNabney "was fully apprised of Mr. Warmbier and his alleged activity in Reno" but chose not to pursue a defense involving Warmbier, believing it to be "frivolous." The court further concluded that any evidence pertaining to Siffin was not Brady material because it did not "sufficiently show that Mr. Siffin was ever in Reno at or near the time of the murder, or that his involvement somehow exculpates Mr. Mazzan." The court did not rule on any other issues.

DISCUSSION

The failure to provide appellant with material information favorable to his defense

Standard of review and applicable law
Determining whether the state adequately disclosed information under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires consideration of both factual circumstances and legal issues; thus, this court reviews de novo the district court's decision. See Smith v. Secretary Dept. of Corrections, 50 F.3d 801, 827 (10th Cir.1995).
Brady and its progeny require a prosecutor to disclose evidence favorable to the defense when that evidence is material either to guilt or to punishment. See Jimenez v. State, 112 Nev. 610, 618-19, 918 P.2d 687, 692 (1996). Failure to do so is a violation of due process regardless of the prosecutor's motive. Id. at 618, 918 P.2d at 692. Where the state fails to provide evidence which the defense did not request or requested generally, it is constitutional error if the omitted evidence creates a reasonable doubt which did not otherwise exist. Id. at 619, 918 P.2d at 692. In other words, evidence is material if there is a reasonable probability that the result would have been different if the evidence had been disclosed. Id.
This materiality "does not require demonstration by a preponderance" that disclosure of the evidence would have resulted in acquittal. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Nor is it a sufficiency of the evidence test; a defendant need not show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434-435, 115 S.Ct. 1555. A reasonable probability is shown when the nondisclosure undermines confidence in the outcome of the trial. Id. at 434, 115 S.Ct. 1555. In Nevada, after a specific request for evidence, a Brady violation is material if there is a reasonable possibility that the omitted evidence would have affected the outcome. Jimenez, 112 Nev. at 619, 918 P.2d at 692; Roberts v. State, 110 Nev. 1121, 1132, 881 P.2d 1, 8 (1994).
In determining its materiality, the undisclosed evidence must be considered collectively, not item by item. Kyles, 514 U.S. at 436, 115 S.Ct. 1555. "[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record." Id. at 439, 115 S.Ct. 1555. The prosecutor is responsible for determining whether evidence is material and should be disclosed. Thus,

*37 a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. See Agurs, 427 U.S. at 108, 96 S.Ct. at 2399-2400 ("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure"). This is as it should be. Such disclosure will serve to justify trust in the prosecutor as "the representative... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.
Id. at 439-440, 115 S.Ct. 1555.
Due process does not require simply the disclosure of "exculpatory" evidence. Evidence also must be disclosed if it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks. See id. at 442 n. 13, 445-51, 115 S.Ct. 1555. Furthermore, "[d]iscovery in a criminal case is not limited to investigative leads or reports that are admissible in evidence." Jimenez, 112 Nev. at 620, 918 P.2d at 693. Evidence "need not have been independently admissible to have been material." Carriger v. Stewart, 132 F.3d 463, 481 (9th Cir.1997), cert. denied, 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998).
In sum, there are three components to a Brady violation: the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material. Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). Mazzan's instant petition for habeas relief is a successive one; therefore, to avoid procedural default under NRS 34.810, Mazzan has the burden of pleading and proving specific facts that demonstrate both good cause for his failure to present his claim in earlier proceedings and actual prejudice. NRS 34.810(3). Cause and prejudice parallel two of the three Brady violation components. If Mazzan proves that the state withheld evidence, that will constitute cause for not presenting his claim earlier. If he proves that the withheld evidence was material under Brady, that will establish actual prejudice. See Strickler, 527 U.S. at ___, 119 S.Ct. at 1949.

Analysis
Mazzan argues that whatever information prosecutors may have provided orally to his counsel before trial was inadequate under Brady. He stresses that only access to the documents themselves would have provided the range and detail of information necessary to fully understand the implications of the police investigation or to dismantle Warmbier's alibi. We conclude that Mazzan is correct and therefore that the record does not support the district court's finding that Mazzan was fully apprised regarding Warmbier. Further, the record and relevant law do not support the court's conclusion that the information regarding Siffin was immaterial.
The state's behavior and arguments in this case have not always been consistent. At times, the state has downplayed the importance of the information at issue and has questioned or even denied Mazzan's right to receive it; nevertheless, the state now concedes that the information was material but maintains that it was fully handed over.
The most obvious inconsistency is that former D.A. Dunlap maintains[2] that he provided Mazzan's trial counsel, McNabney, with all required Brady information on Minor's drug dealings even though in 1981 he refused to provide the same information to Mazzan's post-trial counsel, Flanagan, asserting that it included nothing exculpatory. Dunlap's testimony suggests that he did not convey the information to McNabney in any detail. *38 First, because he did not consider it exculpatory, he had little reason to give McNabney a thorough accounting of the information. Second, if he had already provided the information in full detail and depth to McNabney, there would have been no reason to oppose giving it to Flanagan. Dunlap's concern that Flanagan wanted to conduct a "fishing expedition" is puzzling since Dunlap alleges that he had already disclosed the information in his files and neither he nor McNabney considered it favorable to the defense. Thus, Dunlap's refusal during post-trial proceedings to disclose the documents to Flanagan strongly suggests that Dunlap did not give McNabney all relevant information before the trial.
Mills Lane also believes that he told McNabney everything required by Brady, yet before the trial he rebuked the police captain for providing the press with general information about the investigation because "it's the same as turning [police reports] over to the defense." This rebuke does not appear consistent with a thorough disclosure by the prosecution of the information in question.
Lane is not sure if he told McNabney that the DEA was investigating Warmbier and Siffin, and he actually considers information that Warmbier was in Reno on the day of the murder of little significance. Dunlap similarly admits that he probably did not consider the information on Warmbier to be Brady material. Given this grudging view as to the materiality of the information regarding Warmbier and Siffin, it is evident that Lane and Dunlap did not provide McNabney with the relevant information in sufficient depth or detail to satisfy Brady.
The district court found that the prosecution probably did not provide any documents to the defense. This finding is clearly supported by the record which shows that neither Lane nor Dunlap allowed McNabney to look in their file or provided him with copies of any reports. None of Mazzan's attorneys recalled seeing the documents. As Lane puts it, it was his practice to give defense attorneys a "synopsis" of information he considered relevant.
We assume that the prosecutors tried to provide McNabney orally with the information they considered relevant, but it is clear that this effort fell short of satisfying Brady. For example, Lane informed McNabney that he had documents confirming Warmbier's alibi, but McNabney could not have questioned the authenticity of the signatures on two of the alibi documents without seeing them or questioned the reliability of the alibi sources without reviewing the police reports which connected the sources to Warmbier. Lane and Dunlap may have read the police reports and passed on what they considered the gist of those reports, but they could not have imparted a constitutionally adequate picture to McNabney simply because the picture was too subtle and complicated to be sufficiently conveyed in oral discussions. Moreover, it is almost inevitable that as prosecutors they did not peruse the potentially exculpatory information with the same incentive or attention that defense counsel would have brought to it.
The United States Supreme Court has never held that the Constitution requires an open file policy by prosecutors. Kyles, 514 U.S. at 437, 115 S.Ct. 1555. But providing defense counsel with copies of reports in a case like this would avoid the danger of prosecutors' "tacking too close to the wind," either consciously or inadvertently, by overlooking not only material facts but material implications and connections between facts. Unfortunately, Lane and Dunlap did not avoid that danger here.
The state argues that McNabney knew all about the police investigation of Warmbier and Siffin as shown by McNabney's request at trial to question detectives about their investigation. We conclude, on the contrary, that the trial transcript really shows how little McNabney knew. First, McNabney's comments reveal no detailed knowledge of the investigation. Second, McNabney actually thought that police had gone to Hawaii to investigate, when they had never gone there. This indicates that his knowledge was based more on newspaper reports, which had said investigators would go to Hawaii, than accurate information supplied by prosecutors. Third, McNabney did not discover until the *39 state's case was nearly complete that a police report contained a statement by Minor's sister that Minor had told her he was afraid because of his drug dealings. It is not clear whether this belated discovery was due to the state's late delivery of the report or McNabney's failure to read the report earlier even though he had it. What is clear, however, is that the prosecution did not inform McNabney that the sister's husband was a potential witness. McNabney was completely unprepared when the state called the husband to the stand, and the husband's testimony largely nullified any benefit to the defense provided by Minor's sister's testimony.
Dunlap's closing argument also suggests that prosecutors never fully informed McNabney of the evidence in question. If McNabney had known police investigators posited "a direct connection" between Minor's murder and his Midwest drug activities, it seems unlikely that Dunlap would have repeatedly asserted in closing argument, without apparent fear of contradiction: "There is no evidence [that Minor was killed over some drug deal]. The police were unable to find anything."[3]
McNabney and Mazzan's other former attorneys all testified that they did not see the police reports and were unaware of specifics of the police investigation. For example, it was related to McNabney that "there may have been a possibility" that Warmbier was in Reno at the time, but discussions with the prosecutor satisfied McNabney that Warmbier's alibi was solid. McNabney consistently states that he does not recall ever being told that one person (i.e., Tim Beck) had placed Warmbier in Reno near the time of the murder.
Finally, if McNabney knew in any detail the information in the police reports, it is impossible to understand his failure at trial to cite or use it in any way. Dunlap and Lane both say that McNabney considered the information unimportant, but this cannot be reconciled with McNabney's statement to the trial court that "if we can't get into [the police investigation of Minor's drug connections], we might as well end the whole trial right here." Moreover, it is unconvincing to assert that a defense counsel would have found the information unimportant: the information was important, as the district court ruled[4] and the state now concedes. It appears that McNabney did not consider the information in the police reports unimportant; rather, he accepted the prosecutors' assessments that those reports were unimportant. Such assessments do not satisfy Brady. See United States v. Shaffer, 789 F.2d 682, 690 (9th Cir.1986) (the state cannot satisfy Brady by informing defense counsel of evidence while telling counsel that the evidence is of no value to the defense).
Thus, the record as a whole shows that the prosecution did not provide McNabney with favorable information in the amount or specificity required by Brady.
The district court also did not apply the proper standard in assessing the materiality of the evidence in question. It considered the evidence in isolated bits and found that many of those bits were not exculpatory. The proper question is whether evidence is "favorable," and this "will often turn on the context of the existing or potential evidentiary record." Kyles, 514 U.S. at 439, 115 S.Ct. 1555. Undisclosed evidence must be considered collectively, not item by item. Id. at 436, 115 S.Ct. 1555.
The district court, for example, concluded that the fact that one of Warmbier's alibi witnesses was connected to one of Warmbier's drug associates was not "exculpatory." *40 That fact, however, is favorable and material information under Brady because, along with other weaknesses in the alibi evidence, it casts doubt on the authenticity of the alibi[5] and supports Mazzan's theory that Warmbier is a viable suspect in the murder. It is also further evidence of the insufficiency of the prosecutors' disclosures to McNabney. Despite its dubiousness, Lane accepted the alibi and assured McNabney that it was sound.
The district court thus erred in failing to discern that without including specific details and access to the written reports, the prosecutors' oral disclosures were constitutionally inadequate.
The district court also concluded that the evidence pertaining to Siffin was not Brady material because it did not "sufficiently show" that Siffin was in Reno near the time of the murder or that Siffin's involvement "exculpated" Mazzan. Again, the court failed to consider all the evidence in context and erroneously required the evidence to be definitively exculpatory to be material.
We conclude that the evidence as a whole regarding Siffin was favorable to Mazzan's case. The DEA suspected Siffin, who lived in Bloomington, Indiana, of being "a major cocaine trafficker." Warmbier told Mazzan's investigator that he and Minor worked for Siffin, who was the "brains and money" behind the operation. The three apparently went to Hawaii together about three weeks before the murder. According to one of Minor's friends, Siffin once "slipped some cocaine on" Minor, which highly upset Minor. Shortly before his death, Minor told another friend that he had a big drug deal pending on Wednesday, Thursday, or Friday (he was killed on Thursday) with a "Mr. Big," a large narcotics trafficker from Bloomington, Indiana; this person had once "burned" him and was an "asshole"; this person knew how to get drugs through Hawaiian agricultural inspections; most of the money Minor had belonged to this person; and Minor at one time apparently owed this person about $6,000.00. Months before his death, Minor told one of his sisters that he had a debt and needed money; two weeks before his death, he told another sister that he was afraid because of his drug dealings. Around the time of Minor's murder, Siffin "went underground," and drug investigators had not seen him since.
This evidence casts a rather sinister light on Siffin and was therefore favorable to Mazzan's defense and should have been disclosed. Siffin is likely the "Mr. Big" whom Minor was planning to meet around the time of his murder. Relations were not good between the two men: Siffin had manipulated and endangered Minor before, and Minor disliked Siffin as a result. Minor worked for Siffin on consignment and may have owed him a good deal of money at the time of the murder. Mazzan has now uncovered evidence that Minor stole drugs from Siffin.[6] Finally, Siffin dropped out of sight right at the time of the murder. This evidence does not establish *41 that Siffin was the murderer, but it was certainly favorable to Mazzan's case. We conclude that it would have: 1) contributed to reasonable doubt as to Mazzan's guilt; 2) provided a basis to challenge the thoroughness of the police investigation; and 3) provided a lead which the defense could have pursued to possibly gain further favorable evidence.
We have already discussed Dunlap's refusal to turn the police reports over to post-trial counsel Flanagan as evidence that he did not disclose sufficient information to trial counsel McNabney. This post-trial refusal also constitutes a Brady violation in its own right. In its order denying Mazzan's petition, the district court found that the information in the reports was exculpatory but that McNabney had received the necessary portions of it. The court did not consider that the state withheld this same information from Flanagan, nor have the parties addressed this as a distinct issue. In moving for a new trial in 1981, Flanagan specifically requested any records the state had of Minor's drug dealings. The state refused to provide them, and the district court at that time ruled in favor of the state. The court has now found that the records contained material, exculpatory informationinformation which the state refused to disclose in 1981.
To sum up: the record does not support the district court's finding that the state fully apprised McNabney regarding Warmbier; the court erred in concluding that the information on Siffin was not material and that McNabney had no right to it; and the state also violated Brady when it refused Flanagan's post-trial request for records on Minor's drug dealings. We do not conclude that the prosecutors in this case acted in bad faith. However, the failure to disclose evidence favorable to the defense violates due process "irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S.Ct. 1194; see also Jimenez, 112 Nev. at 618, 918 P.2d at 692 (the prosecutor's motive for withholding exculpatory evidence is immaterial).
The final question is whether the withheld evidence was material. When the state fails to disclose evidence which the defense did not request or requested generally, it is constitutional error if the omitted evidence creates a reasonable doubt, i.e., if there is a reasonable probability that the result would have been different if the evidence had been disclosed. Jimenez, 112 Nev. at 619, 918 P.2d at 692. A reasonable probability is shown when the nondisclosure undermines confidence in the outcome of the trial. Kyles, 514 U.S. at 434, 115 S.Ct. 1555. After a specific request for evidence, a Brady violation is material if there is a reasonable possibility that the undisclosed evidence would have affected the outcome. Jimenez, 112 Nev. at 619, 918 P.2d at 692.
Though McNabney made only a general discovery request before trial, he also tried to examine witnesses in regard to the police investigation but was thwarted by the state's objection.[7] Thus, he made "the functional equivalent of a specific request for the information from the state." See id. at 619, 918 P.2d at 692-93. And Flanagan specifically requested the withheld information. Therefore, the standard is whether there was a reasonable possibility of a different result. We conclude that even under the reasonable probability standard the withheld evidence was material.
There was sufficient evidence to convict Mazzan, but it was not overwhelming. Mazzan certainly had the opportunity to murder Minor, and he initially lied about being present when the murder occurred, but there was never a satisfying explanation of Mazzan's motive, and he had no violent background. The state said the motive was robbery, but the quantity of drugs and money Minor had *42 when he was killed was never clearly established, and the state's closing argument conceded that motive presented some difficulty. The state depicted Mazzan as a calculating murderer who took careful actions, like changing his coat and shoes, to conceal his identity, but it was hardly careful for Mazzan to commit the murder when he knew that three people would be able to place him with the victim at the scene of the crime shortly before the murder. The evidence in the police reports provided support for Mazzan's defense that someone else murdered Minor because of his drug dealing. It also provided a basis to impeach the thoroughness of the state's investigation of the crime. We conclude that the evidence was material and the failure to disclose it undermines confidence in the outcome of the trial.[8]

Other claims
Mazzan contends that he received ineffective assistance of counsel from his trial counsel. We need not decide this issue because of our conclusion that the violation of Brady requires reversal.
Mazzan also lists six other claims which he raised in his petition and which the district court did not address: other instances of ineffective assistance of counsel; destruction of material evidence by the state; conflict-laden counsel; questioning by the state while Mazzan was held without a probable cause hearing; an unconstitutional instruction on reasonable doubt; and improper sentencing instructions. He does not cite the record regarding these claims, does not discuss their merits, and does not address whether they are procedurally barred. Contentions unsupported by specific argument or authority should be summarily rejected on appeal. See Jones v. State, 113 Nev. 454, 468, 937 P.2d 55, 64 (1997); Maresca v. State, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). We therefore have not considered these claims.

Remand to the same district judge
Mazzan claims that his case must be remanded to a judge other than District Judge Breen because Judge Breen was "indifferent" to Mazzan's claims in the instant petition and does not respect the federal constitution. Mazzan cites the trial transcript from another appeal decided by this court, quoting comments made by the prosecutor in that case which were critical of the constitutional rights provided to criminal defendants. See Middleton v. State, 114 Nev. 1089, 1101, 1112 n. 6, 968 P.2d 296, 305, 312 n. 6 (1998), cert. denied, ___ U.S. ___, 120 S.Ct. 322, 145 L.Ed.2d 251 (1999). These comments were made in Judge Breen's court, and Mazzan claims that Judge Breen did not respond to them and thus in effect adopted them.
We conclude that this claim lacks any merit. We are confident that if any further proceedings are necessary in this case, Judge Breen will conduct them in a competent, impartial manner.

Determining whether retrial is permissible
Because his conviction resulted after the state withheld exculpatory evidence and he has been on death row for almost twenty *43 years, Mazzan asks this court to vacate his conviction with prejudice to the state's right to retry him. He says it would be unfair to require him to defend himself with stale evidence. We decline to make that determination and remand this case to the district court. On remand, if the state chooses to pursue the murder charge, Mazzan may raise this claim in district court by the appropriate motion.

CONCLUSION
The record shows that Mazzan's counsel never received full disclosure of material evidence favorable to the defense. This violated Mazzan's due process rights. Mazzan has demonstrated cause for not raising this claim before and prejudice. We therefore reverse the judgment of conviction and remand for further proceedings consistent with this opinion.[9]
MAUPIN, J., with whom YOUNG, J., agrees, concurring:
I agree that Mazzan is entitled to a new trial. The information obtained following his conviction and recapitulated by the majority comprises a body of circumstantial evidence, which undermines the original outcome below. Thus, a jury should hear this evidence in the interest of justice. However, to the extent that the police and members of the Washoe County District Attorney's Office stand accused of misconduct by Mazzan, separate comment is warranted.
In the light of a retrospective analysis, the newly disclosed evidence does carry a certain persuasive force. This notwithstanding, we should remember that the investigators and the prosecutors were presented with a substantial body of highly probative evidence tying Mazzan to the murder of Richard Minor.
Mazzan was present at the scene of the murder at the time of its occurrence. There were no signs of forced entry by other interlopers at Minor's residence. Mazzan was covered in Minor's blood immediately after Minor's homicide. Bloody shoe prints consistent with a pair of shoes Mazzan had been wearing were found at the crime scene. Blood was found in Mazzan's vehicle after he fled without alerting the authorities. Mazzan failed to provide any information about the incident when contacted by Las Vegas police. Mazzan also lied about the events during his initial interaction with investigators in Reno. Finally, it was only after police confronted him with physical evidence incriminating him that Mazzan ultimately admitted to his presence at the crime scene.
The evidence that Mazzan claims exonerates him will only raise inferences that may or may not sufficiently undermine the considerably damning evidence against him. The prosecutors and investigators looking at the case prospectively could reasonably have determined that the evidence in support of Mazzan's theory was not convincing.
It was not misconduct for the police and the prosecutors to subjectively conclude that the actual perpetrator was in custody and properly charged. Likewise, it was not misconduct under the then existing procedures for the prosecutors to make tactical decisions based upon their interpretation of the quality of information available, their interactions with the police and their interactions with defense counsel. Certainly, the provision of a summary of exculpatory information to defense counsel and the statement by that counsel that he would not be contending that one of the other suspects had committed the murder was sufficient for the prosecutor to have concluded that further "Brady" disclosures were unnecessary. Finally, a theory that other persons may have been involved does not, of itself, exonerate a defendant who ultimately admitted his presence during the commission of the murder.
Many of the decisions by these prosecutors, while arguably subject to some criticism in hindsight, were most likely born of a true belief in the validity of the original charges. *44 Thus, the remand for another trial rather than a vacation of the charges is appropriate.
YOUNG, J., concurs.
NOTES
[1] We will refer to Flanagan's role as "post-trial" because it appears that he only represented Mazzan in his motion for a new trial, while Jane McKenna represented Mazzan on direct appeal.
[2] In this context, the present tense is used to refer to what witnesses said at the 1997 evidentiary hearing on the instant petition.
[3] Mazzan asserts that these and similar remarks made by Dunlap were intentionally false and misleading. Since Mazzan's conviction must be reversed due to Brady violations, we need not decide this issue, but if the issue required resolution, the remarks would certainly warrant scrutiny. Cf. U.S. v. Udechukwu, 11 F.3d 1101, 1106 (1st Cir.1993) (it is improper for a prosecutor to question the existence of facts known by the prosecution to exist).
[4] The district court's ruling in 1982 and its latest ruling were also inconsistent. After an in camera review of the District Attorney's file in 1982, the court found nothing exculpatory which needed to be handed over to the defense. In 1997, the court (the same district judge) found that the documents at issue had material exculpatory value. No explanation for this inconsistency is apparent.
[5] As Mazzan asserts and the state effectively concedes, the alibi appears false. None of the alibi documents were sworn statements. Signatures on two documents, purportedly by the same person, Nyland, are clearly dissimilar. Both sources for the alibi were connected to Warmbier: Nyland was his girlfriend, and the other source was apparently the girlfriend of Carmichael, Warmbier's drug associate. Moreover, according to Mazzan's investigator, Nyland does not remember writing her purported alibi letter or recognize the signature on it. The investigator also states that Nyland and Warmbier now admit that Warmbier was in Reno when Minor's body was discovered (consistent with Warmbier's admission to Beck). Thus, the alibi evidence supplied to Lane by Warmbier's lawyer was, to say the least, vulnerable to challenge.
[6] Mazzan's investigator reports that according to Warmbier, Minor stole drugs from Siffin and Siffin was capable of killing Minor. Mazzan also has information that Minor lost $6,000.00 and a large amount of marijuana in a burglary not long before his death. The district court excluded this evidence from the 1997 hearing because the state did not possess or withhold this evidence at trial, and the state argues that this court should not consider it. However, this evidence is relevant to establish the materiality of the evidence which the state did possess. "[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record." Kyles, 514 U.S. at 439, 115 S.Ct. 1555 (emphasis added). The state must disclose "potentially exculpatory evidence" if it is material; it is up to the defense to deal with "problems concerning the extent to which the evidence [can] be used or expanded upon both before and during trial." Jimenez, 112 Nev. at 620, 918 P.2d at 693 (emphasis added).
[7] When McNabney sought to cross-examine the police witnesses on their investigation, the state objected that such evidence was irrelevant hearsay, and the district court agreed and excluded the evidence. This was error because it is a permissible defense tactic to attack the reliability, thoroughness, and good faith of a police investigation. See Kyles, 514 U.S. at 442 n. 13, 445-51, 115 S.Ct. 1555. Evidence "need not have been independently admissible to have been material. Evidence is material if it might have been used to impeach a government witness...." Carriger, 132 F.3d at 481.
[8] In its statement of facts, the state asserts: "Ultimately, Warmbier and Siffin were eliminated as suspects in this case, primarily based on the efforts of the DEA." The state cites Det. Teglia's testimony at the evidentiary hearing in 1997 to support this assertion, but nothing in Teglia's testimony or elsewhere in the record supports this assertion. Although Mazzan's counsel asked Teglia repeatedly if police ever specifically eliminated Warmbier and Siffin as suspects in this case, Teglia never answered with a simple affirmative; in Teglia's view, the evidence against Mazzan "eliminated" other suspects.

The record supports Sgt. Stock's view that Teglia and Penegor were frustrated in their Midwest investigation and never eliminated all other possible suspects in this case. After returning from the Midwest in February 1979, Dets. Teglia and Penegor reported that before their trip, the investigation "had reached a complete standstill," but now they had "new areas ... establishing a more viable case for the prosecution." They had even asked authorities in the Midwest to help continue the investigation. At the time of that report, Mazzan had already been in custody for almost two months, and the record does not reflect any significant developments in the evidence against Mazzan after the report. It is clear that at the conclusion of their Midwest investigation, contrary to their later statements, Teglia and Penegor believed their efforts had been productive and they did not consider Mazzan to be their only suspect.
[9] The Honorable Myron E. Leavitt, Justice, voluntarily recused himself from the decision of this matter.