IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 3, 2016

**STATE OF TENNESSEE v. PAMELA MOSES**

**Appeal from the Criminal Court for Shelby County**
**Nos. 14-05903, 14-06502, 15-00884    J. Weber McCraw, Judge**

---

**No. W2015-01240-CCA-R3-CD  -  Filed September 6, 2016**

---

The Defendant-Appellant, Pamela Moses, entered guilty pleas to theft of merchandise worth $500 or less, tampering with or fabricating evidence, forgery, perjury, stalking, and escape in exchange for an effective sentence of seven years.[1]  Shortly after entry of these judgments, Moses filed a motion to withdraw her guilty pleas, which was denied by the trial court following a hearing.  On appeal, Moses argues that the trial court abused its discretion in denying the motion to withdraw her plea.  We affirm the trial court's denial of the motion to withdraw the guilty plea but remand for correction of clerical errors in the judgment forms.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined.  J. ROSS DYER, J., not participating.

Josie S. Holland, Memphis, Tennessee, for the Defendant-Appellant, Pamela Moses.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin E. D. Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; Paul Hagerman and Bryce Phillips, Assistant District Attorneys General, for the Appellee, State of Tennessee.

---

[1] Although the State asserted at the plea submission hearing that Moses was receiving an effective sentence of eight years, the judgment form for the escape conviction was changed, by agreement of the parties, from a sentence of eleven months and twenty-nine days to a sentence of one day, for which Moses received time served.  This change likely explains why the parties referred to Moses receiving an effective eight-year sentence rather than an effective seven-year sentence.

**OPINION**

On November 18, 2014, the Shelby County Grand Jury indicted Moses in Indictment No. 14-05903 for theft of merchandise worth $500 or less and theft of property worth $500 or less. On December 18, 2014, the same grand jury indicted Moses in Indictment No. 14-06502 for tampering with or fabricating evidence, forgery, retaliation for past action, perjury, stalking, two counts of impersonating a licensed professional, two counts of harassment, and aggravated perjury. On February 19, 2015, the grand jury indicted Moses in Indictment No. 15-00884 for escape from misdemeanor incarceration and evading arrest.

At the April 29, 2015 hearing for these cases, the prosecutor informed the court that he had filed notices of impeachment and of the State's intent to seek enhanced punishment as well as a motion to place Moses on administrative segregation. The prosecutor said that he had listened to the recording from the April 8, 2015 hearing in which the trial court ordered Moses "not to make any phone calls to [the trial court], to anybody's secretaries[,] or to the Clerk's Office." The prosecutor said that he could have someone testify under oath that Moses had "called the Clerk's Office repeatedly" in violation of the trial court's order, and for this reason, he asked the court to terminate Moses's telephone and telecommunication privileges. Moses's attorney countered that the only way to revoke Moses's telephone privileges was to place her in solitary confinement. She added that she believed the telephone calls had stopped and that if the trial court found that termination of Moses's telephone calls was necessary, she asked that the State's order be amended so Moses would not be placed in solitary confinement. The prosecutor responded that he did not know if administrative segregation was treated the same as solitary confinement but said that he would not oppose a modification of the order. Despite this concession, the prosecutor asserted that he had "listened to countless hours of [Moses's] jail calls" and that Moses, within the last week and a half, had repeatedly called individuals in violation of the court's order. He added that Moses had been using these telephone calls "almost as a weapon to bother people to get them to give her information that otherwise her attorney should be going to get[.]" After this exchange, a bench conference took place off the record, which was followed by proceedings involving Moses's submission of her guilty pleas.

**Plea Submission Hearing.** At the April 29, 2015 plea submission hearing, Moses waived her right to a trial by jury and requested the court's acceptance of her guilty pleas in Indictment No. 14-05903 to theft of merchandise worth $500 or less, a Class A misdemeanor; in Indictment No. 14-06502 to tampering with or fabricating evidence, a Class C felony; forgery, a Class E felony; perjury on an official document, a Class A misdemeanor; and stalking involving victim General Sessions Court Judge Phyllis Gardner, a Class A misdemeanor; and in Indictment No. 15-00884 to escape from

misdemeanor incarceration, a Class A misdemeanor. Pursuant to her plea agreement, Moses entered these guilty pleas in exchange for an effective seven-year sentence and the dismissal of the remaining charges in the aforementioned indictments.

During this hearing, the prosecutor summarized the facts supporting Moses's guilty pleas. Regarding the plea to theft of merchandise, he asserted that on December 23, 2013, Moses exchanged price tags on new items with tags on clearance items at a Kohl's store and then attempted to pay the lesser amount at a cash register. As for the plea to tampering with or fabricating evidence, the prosecutor said that on February 1, 2014, Moses fabricated a judicial complaint form to the Tennessee Board of Judicial Conduct against the general sessions judge who previously held Moses in criminal contempt. For the plea to forgery, he stated that the proof would show that Moses forged a notary public's signature and created a false notary seal to make the fabricated judicial complaint form appear official, and this evidence was confirmed by Special Agent Ryan Fletcher with the Tennessee Bureau of Investigation (TBI). The State added that the notary public at issue would have testified at trial that the signature and the seal on the fabricated form did not belong to him. Regarding the plea to perjury, the prosecutor stated that on or about February 1, 2014, Moses gave several statements under oath in a document that were found to be false by Special Agent Fletcher of the TBI. As for the plea to stalking, he said that on or about July 19, 2014, after the general sessions judge held Moses in contempt, Moses repeatedly attempted to contact this judge through electronic media and posted derogatory comments on social media about the judge when she was seeking re-election. Moses also physically approached this judge during her campaign, which required other individuals to intervene in order to prevent Moses from coming into contact with her. Moses then tried to contact the general sessions judge through other individuals and attempted to give her several pro se documents to file. Regarding the plea to escape, the prosecutor explained that Moses had been held in direct criminal contempt in a civil case by the same general sessions judge, and on February 19, 2014, after being found in criminal contempt, Moses was arrested and placed in the back of a police car. Moses subsequently informed the officers that she did not feel well, and they cracked her window. Moses reached through the cracked window, opened her door from the outside, and attempted to jump out of the police car while it was travelling down the interstate. When the officers pulled over, Moses jumped out of the police car, ran across four lanes of heavy traffic, and fell down a rocky embankment, which caused both Moses and the officer chasing her to sustain injuries requiring medical attention.

Counsel who represented Moses on the theft of merchandise charge stipulated that there was a factual basis for entry of Moses's guilty plea as to that count. A second attorney, who represented Moses on the remaining charges, also stipulated that there was a factual basis for entry of Moses's guilty pleas on those charges.

The prosecutor noted that Moses had a mental evaluation that was pending at the time of her plea. He acknowledged that approximately one year prior, the West Tennessee Forensic Services recommended that Moses be transferred to the Memphis Mental Health Institute for further testing "because there were some questions [as] to her competency." He said Moses had been diagnosed with bipolar disorder and had some other issues in 1989 "but nothing to show that she wouldn't be competent." The prosecutor said that in light of her medical history, he had asked for the mental evaluation but had "no reason to believe that [she was] not competent[.]" Both defense attorneys acknowledged that they believed Moses was competent to enter the guilty pleas pursuant to the plea agreement.

The trial court then conducted an extensive plea colloquy with Moses before accepting her guilty pleas. Moses stated that she understood the charges against her as well as the potential sentences, penalties, and consequences for all of her charges. She also was aware of the specific charges to which she was pleading guilty. She acknowledged that by entering guilty pleas, she waived her right to a jury trial and her right to appeal. She recognized that if she proceeded to trial, she would have the right to counsel, to call witnesses on her behalf, to confront any witnesses against her, to testify, though she had a right not to incriminate herself, and to appeal if she were found guilty. She asserted that she was satisfied with both of her attorneys and had no complaints about the legal representation she had received. Moses agreed with the State's recitation of facts supporting her guilty pleas.

Moses also acknowledged that no one had forced her to plead guilty and that she had not received any promises beyond the terms of her plea agreement. The trial court confirmed that Moses understood the questions it had asked during voir dire. Moses affirmed that she was not suffering from any mental health issues and was not taking any medication that would keep her from understanding the proceeding. She recognized that her guilty pleas could be used against her to enhance or increase sentences for any later crimes and that her attorneys had negotiated with the prosecutor to reach the plea agreement. She reiterated that she understood the consequences of entering her guilty pleas and did not have any questions of her attorneys or the court. Moses then entered guilty pleas to theft of merchandise, tampering with or fabricating evidence, forgery, perjury, stalking, and escape. The trial court found that Moses was competent to enter her guilty pleas and that she understood the direct and indirect consequences of entering these pleas. The court also found that Moses had freely, voluntarily, and intelligently entered her guilty pleas and that there were sufficient facts supporting the pleas. Moses stated that she understood the sentences that she was receiving in exchange for her guilty pleas and that she agreed to these sentences in the plea agreement. She also acknowledged that she would be on intensive probation for the first two years, would have to complete and continue her mental evaluations and follow any recommendations,

and would have no contact with any of the victims, particularly the general sessions judge or the TBI agent. Moses stated that she had been adequately advised of all the rules of probation and that if she violated these rules she could be incarcerated. She said she had no questions about the entry of her guilty pleas or the proceeding. The trial court accepted her guilty pleas, imposed the sentences specified in the plea agreement, and ensured that the remaining charges were dismissed. Pursuant to her plea agreement, Moses's sentences were suspended to probation, and she was given time served on her one-day sentence for the escape conviction.

The judgments for Moses's convictions were entered on April 29, 2015. On May 29, 2015, Moses filed a timely motion to withdraw her guilty plea, arguing that her plea was not knowing and voluntary and that the State failed to disclose exculpatory evidence prior to entry of her plea.

**Evidentiary Hearing.** At the June 23, 2015 evidentiary hearing on Moses's motion to withdraw her guilty plea, the State entered two exhibits into evidence: Exhibit 1, which contained the discovery material that was given to defense counsel, and Exhibit 2, which contained discovery material that the State had inadvertently failed to provide to defense counsel prior to entry of Moses's guilty pleas.

The prosecutor involved in the plea testified that TBI Agent Fletcher prepared investigative reports for the Grand Jury prosecutors in the cases against Moses and that these investigative reports, which totaled approximately two hundred pages, were provided to defense counsel. The prosecutor explained that at the time of Moses's case, he was relatively new to circuit court and had never worked on a case that had been investigated by the TBI. He asked Agent Fletcher if the approximately two hundred pages constituted all of the reports, and Agent Fletcher informed him that all of his investigative reports were placed on ISIS, a computer program. The prosecutor then asked Cheryl Hayes, the only individual in the Criminal Investigation Division Unit with access to ISIS, to provide him with all of the investigative reports in Moses's cases. Hayes later gave him a computer disk containing investigative reports 1 through 55, which he provided to defense counsel. When defense counsel had difficulty opening the files on the disk, the prosecutor printed the files on the disk and provided them to her. At the time, the prosecutor knew that defense counsel also represented Moses on the escape and evading arrest charges, which had not been investigated by the TBI, and that she had received discovery as to those two charges. He acknowledged that the State did not have a copy of the transcript from the contempt proceeding that was related to the escape charge. The prosecutor said he gave defense counsel all of the discovery materials of which he was aware pursuant to the district attorney office's open file discovery policy. At the time, he did not know that the TBI would add information to the ISIS system and

-5-

was not aware that he needed to check with Cheryl Hayes to see if the TBI had added additional information.

The prosecutor said that after he moved to have Moses placed on administrative segregation following her violation of the trial court's order not to call the clerk's office, both defense attorneys approached him about a possible settlement. The prosecutor said that on the day Moses entered her guilty pleas, he did not know that a plea would be entered and did not have the entire file with him but nevertheless agreed to entry of the plea at the request of both defense attorneys. He then spoke to the general sessions judge, one of the victims, to confirm that she was not opposed to the contents of the plea agreement. The prosecutor asked both defense attorneys if they were comfortable with the plea going forward even though Moses's final mental evaluation had not been completed, and they responded affirmatively and said they had no question about Moses's competency. The prosecutor said that the process of entering Moses's guilty pleas took two to three hours.

The prosecutor said that approximately one week after Moses entered her guilty pleas, defense counsel, who represented her on all the charges except the theft charge, told him she had filed a motion to withdraw the plea based on missing discovery, of which the prosecutor was not aware. Defense counsel was particularly concerned about the statements of Divine Mafa[2] and Moses's friend named "Joe" that had not been disclosed. When the prosecutor called Agent Fletcher to ask about these two individuals, Agent Fletcher told him he should have all the information regarding Divine Mafa. He also said he had taken a statement from Amy Jo, Moses's friend, but did not believe that her statement was relevant to the investigation. The prosecutor then went to see Cheryl Hayes, who accessed the information in ISIS and noted that she now had investigative reports 1 through 73. At that point, the prosecutor realized that some materials had been inadvertently omitted from the discovery disclosures, and he had Hayes put the investigative reports 56 through 73 on a disk, which he reviewed. He said some of this new information had to do with crimes that were not indicted, so Moses was not entitled to it. Other information constituted Agent Fletcher's work product, which was not discoverable. Once the prosecutor was made aware of the missing materials, he immediately provided this information to defense counsel.

The prosecutor stated that in Divine Mafa's statement, Mafa expressed a desire to prosecute Moses for theft of property, for which Moses was never charged. He said he never intended to use Divine Mafa as a witness because he was not a victim in any of the charged counts, including the counts for impersonating a licensed professional. He explained that the two charges for impersonating a licensed professional stemmed from

---

[2] Although the appellate record identifies this individual as both "Divine Mafa" and "Devine Mafa," we will refer to him as "Divine Mafa" in this opinion.

an incident in which Moses tried to be sworn in as an attorney in court, which was witnessed by the general sessions clerk, and an incident in which Moses posed as an attorney for Tasha Liggins before the aforementioned general sessions judge. The prosecutor asserted that any information about Moses's representation of Divine Mafa would not be exculpatory because the charges for impersonating a licensed professional did not relate to him.

The prosecutor said that in Amy Jo Boone Wild's statement, Wild asserted that she and Moses were close friends. He said Wild was not a victim in any of the cases, and Wild's statement was in no way related to the charges to which Moses pled guilty. In her statement, Wild acknowledged that she had not witnessed any of the offenses with which Moses was charged or to which she pled guilty. He noted that Moses, in her statement to the TBI, stated "Jo Boone" was one of several individuals who could provide information relating to her case. The prosecutor expressed his belief that the trial court conducted a very extensive voir dire of Moses before accepting her guilty pleas and that Moses entered a knowing, voluntary, and intelligent plea to the charges in the plea agreement.

The prosecutor stated that the proceeding related to the tampering with or fabricating evidence charge was the judicial complaint Moses made against the general sessions judge. He explained that the document Moses forged was also the document related to the fabricating evidence charge.

Moses testified that her April 29, 2015 guilty pleas were not voluntary because her incarceration since December 18, 2014, had kept her from her mother, who had a heart condition, and her child, who was currently living with his father, a less than desirable parent. She claimed she made the decision to enter her guilty pleas when the prosecutor asked for her to be placed on administrative segregation, which made her "scared" and "distraught" because she had served the first two weeks of her incarceration in solitary confinement. She stated, "[My] "biggest fear [about] being on solitary confinement [was] that I wouldn't be able to communicate with anyone, not even [defense counsel]." In response to questioning by the trial court, Moses's attorney conceded that the trial court never heard or granted the motion for administrative segregation at the time Moses entered her guilty plea. Moses explained that she was initially placed in jail when the general sessions judge held her in contempt for representing herself pro se, and she had tried to exonerate herself since that time. She also said the TBI and the prosecution had lied about her conduct, including their claim that she represented individuals other than herself in court. Moses, who called herself a "legal connoisseur," claimed that she would not have been able to prepare a legal defense to the approximately twenty-five-year sentence she faced for these charges if she had been placed in solitary confinement.

-7-

Special Agent Ryan Fletcher of the TBI testified that he interviewed Moses on November 6, 2014. After he placed Moses under oath, she gave a sworn statement that she signed and initialed on each page. Agent Fletcher said one of the names provided by Moses in her statement was "Jo Boone." He initially asked Moses to provide the sworn statement because he was "working on her case." He acknowledged that Moses may have understood this to mean that he was investigating the judicial complaint Moses had filed against the general sessions judge.

At the conclusion of the evidentiary hearing, the trial court made the following ruling:

> I think there are two issues for the Court to consider. First, I'm going to consider Exhibit 2, the evidence that wasn't provided. Certainly, there is concern with this Court and for everyone that it should have been provided. The issue is, could it prove or disprove a fact, or could it be used somehow for sentencing purposes?
>
> So I've reviewed Exhibit 2, it is a part of this hearing today, so I've reviewed it while I've been here. So then the questions come up, is it exculpatory? Did it violate her due process? Is it material? Certainly, her due process she should have had that, but is it such a violation to be material? . . . .
>
> The Court [must] find[] that the evidence would be material or exculpatory. If there was a reasonable likelihood that the undisclosed evidence would have affected the verdict; did it create some type of reasonable doubt that otherwise would not exist [as to] the defendant's guilt?
>
> Going through Exhibit 2, I don't find that, which is why I asked if those witnesses were here, perhaps they could verify that. They haven't. And the burden . . . is upon the defendant to show that there would have been a reasonable likelihood, or it could create reasonable doubt. [The prosecutor who represented the State during Moses's guilty plea] testified [that] largely those statements were based on potential crime[s] that were never charged. So the Court does not find that the omitted evidence is material or it would have been exculpatory.
>
> [Second, I must] consider whether or not the plea was knowingly, voluntarily, and intelligently made, . . . I recall [the plea submission hearing] very well, because Ms. Moses was here, sitting there, I was here.

And it probably went an hour. We had a long conversation, and I wanted to make certain that Ms. Moses knew what she was doing. [It was] probably the longest plea I've ever done. Before I get to the plea, I will state that I took a recess to allow the lawyers to try to resolve it. There were many charges. I was encouraging the lawyers to take the time they needed.

Yes, I'm down here specifically [for this case], but I can come back. I think I've always made that known that I'm available to hear these cases. So there was a long period of time where the Court just took a break, I think, for several hours, left the building, and came back. And I go through the technical record and there are petitions for waiver of trial by jury, request[s] for acceptance of a guilty plea, and it goes through all the rights that Ms. Moses has, [it was] signed by lawyers, signed by Ms. Moses. You know, looking through Exhibit 2, I think Mr. Mafa in some of his affidavit, says Ms. Moses assisted [him] with review and completion of legal documents.

You know, Ms. Moses is a very smart lady. I think we talked about that when I was doing the plea, that she understands, she's educated. She has great legal knowledge. So the lawyers go through these forms, they have the waivers, they have the charges. And the lawyers are required to make certain that Ms. Moses understands her rights.

Going back a little further, I think when I first came, Ms. Moses did not have a lawyer representing her on all charges. I encouraged her [to get] a lawyer. Even though she was well-versed in the law, that she needed a lawyer to represent her. And I think I ended up appointing [defense counsel] to additional cases, so she would be fully represented on all of her charges.

Having said that, everyone had a chance to review these documents, because there was a question about it being a rush-job plea . . . . It wasn't a rush rob as far as filling out the paperwork and going through it. Certainly, I don't know the conversation you had, but there w[ere] many hours that passed while documents were being completed. Then it gets to the plea. Again, I don't think I've ever gone through a plea [more extensively than I did in this case] to make certain that Ms. Moses was certain of all of her rights, that she understood what she was doing.

One of [the questions I asked was]: ["]Is anyone forcing you to enter this plea?["] And then I asked, ["]Is anyone promising you anything

to enter this plea?["] And Ms. Moses indicated that she was not being forced, that no one was forcing her.

Again, I gave her numerous chances to go through and tell me if she had any concerns. I asked her if she had any concerns about her lawyers [and] I was very deliberate. At one point, I asked her if she had any questions for the Court. At that point, she asked me if Lanita McCraw was my aunt. And I said, Yes, she is. Why? Does that create a problem? Do you want me to recuse myself? I went through—she said, No. I knew her from Election Day, she's a nice lady.

And I made certain that if that was an issue, I was here to make sure that she was treated fairly, because she consistently has not liked the charges brought against her and had opposition to different things. But I always tried to make certain that Ms. Moses knew I was here to be fair with her. I didn't choose to come down here. And when I finished . . . that day, I would be leaving and hopefully not be back. But now I'm back to make certain, again, that she was treated fairly.

Going through all of this, Ms. Moses answered each question, which indicated to me that she understood what she was doing, that she was entering it knowingly. And I was convinced that it was intelligently made. The only issue that remained out there was any competency issue, because there had been filed a motion for her to be evaluated. The Court believes it raised that [issue] and everyone felt that was no longer an issue. I was comfortable after questioning Ms. Moses that she understood this process fully and that she was entering the plea knowingly, voluntarily, and intelligently.

The appropriate facts were stated on the record, they were sufficient for the Court to accept the pleas as they were presented. And, in fact, I think it was stated that there were potential charges that may be forthcoming, maybe a [s]tatute of [l]imitations issue that was coming up. And by agreement, those would not be pursued. So there was a lot o[f] conversation regarding all these issues.

To conclude what I should do, which is a motion to set aside the plea, the Court should only do that . . . to correct any manifest injustice. There's been no injustice made on this plea. Again, I'm here on legal issues. As I told Ms. Moses today, I'm not here on personal issues. I'm just here to follow the law, which I am doing.

I'm denying the motion to withdraw the plea, because the Court does not find that there is any manifest injustice, that it was knowingly, voluntarily, and intelligently made. [A] plea of guilty is a very serious, [an] important part of the legal process. And the Court took it seriously and addressed it that way with Ms. Moses, and I found that she answered in such a way that she understood. Therefore, the motion is hereby denied.

A minute entry, dated June 23, 2015, showed that the trial court denied the motion to withdraw guilty plea, and Moses filed her notice of appeal the same day.

## ANALYSIS

Moses argues that the trial court abused its discretion in denying her motion to withdraw her guilty plea. She claims she is entitled to a withdrawal of the plea to correct manifest injustice because the State failed to disclose exculpatory evidence prior to entry of her guilty plea, because her guilty plea was not knowingly, voluntarily, or intelligently entered, because her due process rights were violated when she was summarily held in contempt, and because the cumulative effect of these errors requires relief. After reviewing the record and the parties' briefs, we conclude that the trial court did not abuse its discretion in denying Moses's motion to withdraw her guilty plea.

This court reviews a trial court's decision regarding a motion to withdraw a guilty plea for an abuse of discretion. State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010) (citing State v. Crowe, 168 S.W.3d 731, 740 (Tenn. 2005)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." Id. (citing State v. Jordan, 325 S.W.3d 1, 38-40 (Tenn. 2010)). A trial court's discretion is "strictly curtailed" when a constitutional violation is established, such as the denial of due process. State v. Mellon, 118 S.W.3d 340, 346 (Tenn. 2003) (citing State v. Davis, 823 S.W.2d 217, 220 (Tenn. Crim. App. 1991)).

Here, Moses's judgments were entered on April 29, 2015, and she filed her motion to withdraw her guilty pleas on May 29, 2015. "As a general rule, a trial court's judgment becomes final thirty days after its entry unless a timely notice of appeal or a specified post-trial motion is filed." State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996) (citing Tenn. R. App. P. 4(a), (c); State v. Moore, 814 S.W.2d 381, 382 (Tenn. Crim. App. 1991)); see also State v. Peele, 58 S.W.3d 701, 706 (Tenn. 2001) (holding that a timely filed Rule 32(f) motion stays the judgment until the trial court rules on the motion to set aside the guilty plea). Because Moses filed her motion to set aside her

guilty pleas after her sentence was imposed but before the judgments became final, the more demanding standard, "to correct manifest injustice," applies to our review of the trial court's denial of the motion. See Tenn. R. Crim. P. 32(f)(2); Crowe, 168 S.W.3d at 741. "This standard is based 'upon practical considerations important to the proper administration of justice.'" Crowe, 168 S.W.3d at 741 (quoting Kadwell v. United States, 315 F.2d 667, 670 (9th Cir. 1963)). A guilty plea may be withdrawn under the manifest injustice standard when

> (1) the plea "was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily"; (2) the prosecution failed to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and this failure to disclose influenced the entry of the plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

Phelps, 329 S.W.3d at 444 (quoting Crowe, 168 S.W.3d at 742 (internal footnotes omitted)). This court has also concluded that a denial of due process constitutes manifest injustice as a matter of law. Id. (citing Crowe, 168 S.W.3d at 742-43). The defendant bears the burden of establishing that his or her plea should be withdrawn to correct manifest injustice. Id. (citing State v. Turner, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995)).

**A. Failure to Disclose Exculpatory Evidence.** Moses claims the State violated her due process rights when it failed to provide her with the following exculpatory evidence: (1) the statement of Divine Mafa; (2) the statement of Amy Jo Boone Wild; and (3) impeachment evidence regarding the aforementioned general sessions judge, which includes (a) the case file or any other record regarding the child molestation case at the Georgian Hills daycare center where convictions were set aside for prosecutorial misconduct, and (b) the general sessions judge's personnel file from the Shelby County District Attorney's Office. Moses claims that if this evidence had been disclosed, she might have been able to utilize it to receive a lower bond as she awaited trial.

In order to establish a Brady violation, the following four elements must be established by the defendant: (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); (2) that the State suppressed the information; (3) that the information was favorable to the accused; and (4) that the information was material. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001) (citing State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995)).

The defendant has the burden of proving a Brady violation by a preponderance of the evidence. See Edgin, 902 S.W.2d at 389.

Here, the State essentially concedes that the first two elements for establishing a Brady violation were met. Information favorable to the accused, the third element, includes evidence that could exonerate the accuse, corroborate the accused's position in asserting his innocence, or enable defense counsel to conduct further and possibly productive investigation regarding the fact that someone other than the defendant committed the charged crime. Id. (citing Marshall, 845 S.W.2d at 233). It also includes evidence that corroborates the defendant's version of events, calls into question an important although not indispensable part of the State's version of the events, or challenges the credibility of a key State witness. Id. (citing Commonwealth v. Ellison, 379 N.E.2d 560, 571 (1978); Mazzan v. Warden, Ely State Prison, 993 P.2d 25, 37 (Nev. 2000)). Finally, as to the fourth element, we note that information is considered material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. (quoting Edgin, 902 S.W.2d at 390; Walker, 910 S.W.2d at 389; State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998)).

Although Moses claims Divine Mafa's statement was exculpatory, our review of his statement shows it was, in fact, incriminating. In it, Mafa acknowledged that Moses assisted him with "legal counseling" in a case around April 2014. Mafa said that although Moses informed him she was "not a lawyer," she also told him she knew "a lot about the law." When Mafa asked Moses for "legal advice," she told him that she "did consultations under Red Sea Consultants." Mafa said Moses conducted legal research for him and drafted and reviewed legal documents for him. She also "correct[ed] grammar" in the documents that Mafa drafted. Moses referred to herself as "the watch dog." In a later telephone conversation with Agent Fletcher, Mafa stated that Moses had created legal documents for him, that he had paid Moses for her legal work, and that he believed Moses was stealing money from him by paying bills out of his account.

At the evidentiary hearing, the prosecutor testified that the State never charged Moses with theft or impersonating an attorney based on her involvement with Mafa. He said the conduct that formed the basis for the two counts of impersonating a licensed professional stemmed from an incident in which Moses tried to be sworn in as an attorney in court and an incident in which Moses posed as an attorney for Tasha Liggins before the aforementioned general sessions judge. He stated that Mafa was not a victim in any of Moses's charges and that he never intended to call Mafa as a witness at trial.

Initially, we note that Moses has failed to establish a due process violation regarding Mafa's statement. Moses was well aware that she had assisted Mafa in some

capacity in his legal matters and could have obtained Mafa's statement or subpoenaed him if she felt he would provide favorable information to her case. See Johnson, 38 S.W.3d at 56. We also agree with the State's assertion that Mafa's statement was not favorable to the accused. While Moses claims that Mafa's statement was favorable because he said Moses never called herself a lawyer, never represented him in court, and only corrected his grammar in documents he drafted, Mafa's statement establishes that Moses conducted legal research for him, drafted and reviewed legal documents for him, and was paid for this legal work. The statement also shows that Moses committed the offense of theft against Mafa when she paid bills out of his account.

Finally, we agree with the State that Mafa's statement is not material because there is no reasonable probability that, had this evidence been disclosed to the defense, Moses would not have entered her guilty plea. See Johnson, 38 S.W.3d at 56 (stating that information is considered material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'"); see also Phelps, 329 S.W.3d at 444 (stating that a guilty plea may be withdrawn under the manifest injustice standard when the prosecution failed to disclose exculpatory evidence as required by Brady and "this failure to disclose influenced the entry of the plea").

We will next consider the State's failure to disclose Amy Jo Boone Wild's statement. Wild, in her statement, asserted that she and Moses had been friends for six years and that they had met through "a mutual friend" named "Dagmar Bergham." Wild described Moses as a "community activist[.]" She said she had "never heard Pamela [Moses] say she [was] an attorney" but acknowledged that she had not observed any of the conduct that led to Moses's charges. Wild was aware that Moses "used Red Sea Consultants to do business and consulting work." She said she went with Moses to meet Mafa and that, "as far as [she] kn[e]w," Moses was "just helping him and giving him advice." She added that she thought Moses "would consult with lawyers about what she was doing to make sure she wouldn't get in trouble." Wild said Moses may have talked to "Diamond," an attorney in Memphis; Leonard Van Eaton, an attorney in Memphis; and "Columbus," who lived in Washington D.C. She understood that Moses "couldn't get paid for her help" but that "some people would give her gifts as appreciation." Wild also identified "Maria Debacco," "a friend of Pamela's[,]" who had testified on Moses's behalf as a character witness.

At the evidentiary hearing, the prosecutor testified that Wild was close friends with Moses, that Wild was not a victim in any of the offenses, and that Wild had not witnessed any of the offenses with which Moses had been charged. He also noted that Moses, in her statement to the TBI, had said that "Jo Boone" was an individual who could give information related to her case.

-14-

Again, we note that Moses has failed to establish that the State's failure to disclose Wild's statement constituted a due process violation. Moses knew of Wild's existence as a witness and, in light of their friendship, could have easily obtained Wild's statement or subpoenaed her if she felt Wild could provide information favorable to her case. Although Moses argues that Wild's statement "portrayed [her] in a positive light" and provided the names of other women who "would have vouched for [her]," we conclude that Wild's statement was not favorable to the accused because Wild admitted she had never observed any of the conduct related to Moses's charges. Although Wild referred to other individuals in her statement, none of these individuals testified at the evidentiary hearing. Moreover, Moses knew these named individuals because they were her friends or were people who had helped her in the past, and she could have easily taken their statements or subpoenaed them herself if she believed they could provide favorable evidence. Wild's statement, like Mafa's, is not material because there is no reasonable probability that, had this evidence been disclosed to the defense, Moses would not have entered her guilty plea. See Johnson, 38 S.W.3d at 56; see also Phelps, 329 S.W.3d at 444. Accordingly, the trial court did not abuse its discretion in denying the motion to withdraw guilty plea based on the State's failure to disclose the statements of Divine Mafa or Amy Jo Boone Wild.

Finally, as to the "impeachment evidence" regarding the general sessions judge, Moses claims the State's failure to disclose this information violated her rights to due process because the evidence diminished the judge's credibility as a State witness in the cases against Moses. In making this claim, Moses does not argue that the information involving this judge was a part of the materials the State inadvertently failed to disclose to the defense. More importantly, Moses never mentioned the material concerning this judge at the hearing on her motion to withdraw her guilty pleas. Because the State's failure to disclose the information about this judge was never mentioned or ruled on by the trial court at the evidentiary hearing, this issue is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); State v. Lyons, 29 S.W.3d 48, 50 (Tenn. Crim. App. 1999) (Issues not raised in the trial court are waived); Turner, 919 S.W.2d at 356-57 ("A party may not raise an issue for the first time in the appellate court."). Waiver notwithstanding, we conclude that the State's failure to disclose the general sessions judge's personnel file during her time with the district attorney's office and her prosecution of a child molestation case more than twenty years prior does not entitle Moses to relief. The child molestation case was public record that Moses found on her own, and there was no proof presented at the evidentiary hearing showing that the personnel file would have provided evidence that was favorable to the accused or

material.  For these reasons, the trial court did not abuse its discretion in denying Moses's motion to withdraw her guilty plea based on the State's failure to disclose this evidence.

**B.  Plea Was Not Knowingly, Voluntarily, and Understandingly Entered.**
Moses also contends that her guilty plea was not knowingly, voluntarily, or understandingly made in light of her concerns about her son and her mother, the State's failure to disclose the aforementioned exculpatory evidence, and the State's recitation of the factual basis for her guilty pleas.  She also contends, for the first time in her reply brief, that her plea was involuntary because the State's motion to place her in "solitary confinement" prior to entry of her plea was coercive.  Because the evidence shows that Moses's guilty plea was knowing, voluntary, and intelligent, she is not entitled to relief.

Before a guilty plea is accepted by the trial court, there must be an affirmative showing that the plea was voluntarily and knowingly entered.  Boykin v. Alabama, 395 U.S. 238, 242 (1969); State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977), superseded on other grounds by rules as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000).  This requires a showing that the defendant was made aware of the significant consequences of the plea.  Mackey, 553 S.W.2d at 340.  A plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'"  Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43).  A trial court must look at the following circumstantial factors before determining whether a guilty plea is voluntarily and intelligently made:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Crowe, 168 S.W.3d at 748-49 (quoting Blankenship, 858 S.W.2d at 904).

First, Moses claims her plea was not knowing or voluntary because she was worried about her son and her mother and because the exculpatory evidence withheld by the State, which was discussed in the previous section, affected her assessment of the risks that she might face at trial.  As for Moses's claim regarding the withheld evidence, we have already concluded that this evidence was neither favorable to the accused nor material, so it would not have affected Moses's assessment of the risks she might face at trial.  Turning to Moses's claim that she was concerned about her son and her mother at the time of her plea, the transcript of the plea submission hearing shows that the trial

court conducted an extensive plea colloquy with Moses prior to accepting her guilty plea. The court confirmed that Moses knew her rights, the charges against her, the possible sentences she was facing, and the consequences of her pleas. It also confirmed that Moses was entering her plea freely and voluntarily and that she was not suffering from any mental condition and was not taking any medication that would affect her understanding of the plea. There was absolutely no indication at the plea submission hearing that Moses was coerced into entering her plea, that she was entering her plea through fear or fraud, or that her plea was involuntary.

At the evidentiary hearing, the trial court found that Moses was an extremely intelligent individual, that Moses had been represented by competent counsel, and that Moses had shrewdly concluded that entry of the plea was in her best interest. The plea agreement was extremely favorable to Moses because it dismissed several of her charges and entitled her to a suspended sentence. The record shows that at the time she entered her plea, Moses was familiar with the criminal justice system because she had been convicted previously of several offenses. Because the record fully supports the trial court's finding that Moses's plea was knowing, voluntary, and intelligent, we conclude that the court did not abuse its discretion in denying the motion to withdraw the plea on this basis.

Second, while conceding that she did not object to the State's factual recitation during the plea submission hearing, Moses now claims the facts provided by the State in support of her guilty pleas were problematic because: (1) the State failed to clearly identify the "official proceeding" that was pending at the time that Moses allegedly tampered with or fabricated evidence as charged in Count 1, and because Agent Fletcher led her to believe that he was investigating her complaint against the general sessions judge when he was in fact investigating Moses at the time he took her statement; and (2) her guilty pleas to Counts 1, 2, and 4, which all stemmed from the same offense, violated her right against double jeopardy.

Although Moses complains about the State's recitation of the factual basis supporting her guilty pleas, she never objected to this recitation prior to entering her plea and failed to raise this issue at the evidentiary hearing. Consequently, this issue is waived. See Tenn. R. App. P. 36(a); Lyons, 29 S.W.3d at 50; Turner, 919 S.W.2d at 356-57. In any case, Moses is not entitled to relief based on the State's recitation of the facts. The record makes it clear that the "official proceeding" pending at the time that Moses fabricated evidence was the judicial complaint she filed against the general sessions judge. Moreover, the fact that Agent Fletcher led Moses to believe that he was investigating this judge rather than Moses at the time she gave her statement had no impact on the validity of the State's recitation of the facts supporting her plea. As to Moses's double jeopardy claim, the State asserted at the plea submission hearing that the

facts supporting Moses's guilty pleas to Counts 1, 2, and 4 were that Moses fabricated a judicial complaint form against a general sessions judge, that Moses forged the signature and seal of a notary public on the fabricated form, and that Moses made several statements under oath in a document that were found to be false by Agent Fletcher. Even if Moses's convictions in Counts 1, 2, and 4 arguably arose from "the same act or transaction," these crimes do not constitute to the same offense because each statutory offense includes an element not contained in the others. See State v. Watkins, 362 S.W.3d 530, 545-46 (Tenn. 2012); see also T.C.A. §§ 39-16-503, 39-14-114, 39-16-702. Because these offenses are distinct and do not violate double jeopardy protections, Moses is not entitled to relief.

**C.** **Violation of Due Process Rights.** Moses argues that even if this court determines that her plea was knowingly, voluntarily, and understandingly entered, we should allow her to withdraw her plea because the general sessions judge abused her discretion in summarily holding her in contempt, which violated her rights to due process. See Turner, 919 S.W.2d at 352-53 (holding that even though the trial court complied with "Rule 11, Boykin, Mackey, and McClintock," both the trial court and this court must consider "all of the relevant circumstances" that existed at the time of the plea in determining whether a plea of guilty was voluntarily, knowingly, and intelligently entered). Although Moses acknowledges that there is no record of her contempt proceeding, she claims the State failed to provide an arrest order or any documentation regarding the criminal contempt in discovery. She also asserts that the judge held her in contempt, not because she had obstructed the administration of justice, but because she filed a motion for recusal of the judge and because she was not taken seriously as a pro se litigant in her civil cases by this judge.

Once again, because Moses failed to raise this issue before the trial court at the hearing on her motion to withdraw her plea, this issue is waived. See Tenn. R. App. P. 36(a); Lyons, 29 S.W.3d at 50; Turner, 919 S.W.2d at 356-57. Regardless, she is not entitled to relief on this issue. There is simply no record upon which this court can make a determination. We further question the efficacy of Moses's attempt to invalidate the criminal contempt imposed by the general sessions judge for the first time in this appeal. Because Moses failed to establish that she was denied due process when the general sessions judge held her in criminal contempt, she has not shown that the withdrawal of her guilty plea is necessary to correct manifest injustice.

**D.** **Cumulative Effect of Errors.** Citing State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010), Moses asserts that "the circumstances in their totality were coercive and that the plea was not voluntary." She claims that if the three previous errors, when viewed individually, were not enough to warrant "a new trial," then the cumulative effect of these errors requires "a new trial." We question whether the entry of Moses's guilty

pleas could be considered "trial proceedings" for the purpose of the cumulative error doctrine. Nevertheless, because Moses is not entitled to relief on any of her issues on appeal, we need not consider the cumulative effect of the alleged errors. See id. at 77 ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings."). We have already concluded that the circumstances surrounding Moses's guilty plea were not coercive and that her plea was voluntary, knowing, and intelligent.

Lastly, we detect some clerical errors that require correction in the judgments forms in these cases. While the transcript from the plea submission hearing shows that the trial court, pursuant to the plea agreement, ordered the conviction for theft of merchandise in Indictment No. 14-05903 be served concurrently with convictions in Indictment No. 14-06502, the judgment form for the theft conviction indicates that it is served consecutively to the convictions in Indictment No. 14-06502, despite the fact that the remaining judgment forms for the convictions in Indictment No. 14-06502 correctly show that the theft is served concurrently with them. Therefore, we remand the case to the trial court for entry of a corrected judgment in count one of Indictment No. 14-05903 showing that the theft of merchandise conviction is served concurrently with the convictions in Indictment No. 14-06502. In addition, while the trial court noted in the special conditions box on some of the judgment forms that the State was entering a nolle prosequi as to count two in Indictment No. 14-05903, as to count three and as to counts six through ten in Indictment No. 14-06502, and as to count two in Indictment 15-00884, the court did not enter separate judgment forms for each of these counts, as recently required by the Tennessee Supreme Court. See State v. Marquize Berry, No. W2014-00785-SC-R11-CD, slip op. at 4 (Tenn. Nov. 16, 2015) (order summarily granting the application of the defendant under Rule 11 of the Tennessee Rules of Appellate Procedure and reversing a portion of the judgment of the Tennessee Court of Criminal Appeals) ("For charges resulting in a not guilty verdict or a dismissal, the trial court should 'enter judgment accordingly' as to the respective count." (citing Tenn. R. Crim. P. 32(e)(3)). Therefore, we also remand the case to the trial court for entry of separate judgment forms showing the entry of nolle prosequi as to the specified counts.

## CONCLUSION

We affirm the denial of the motion to withdraw guilty plea but remand the case for entry of corrected judgments as specified in this opinion.

_____
CAMILLE R. McMULLEN, JUDGE

-19-