IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 18, 2026

## VONDA STAR SMITH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Greene County**
**No. 2022CR223     John F. Dugger, Jr., Judge**

_____

## No. E2025-00640-CCA-R3-PC

_____

Petitioner, Vonda Star Smith, appeals the denial of her petition for post-conviction relief, arguing that the post-conviction court erred in denying her claim that the State withheld exculpatory evidence in violation of *Brady v. Maryland*. Petitioner also argues that the post-conviction court erred in denying her claims that trial counsel was ineffective for failing to (1) obtain a DNA expert, (2) object to a comment made by the trial court, (3) object to the State's introduction of an undisclosed impeachment statement, and (4) call a corroborating witness. Upon review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P. J., and J. ROSS DYER, J., joined.

Cody T. Knight, Erwin, Tennessee, for the appellant, Vonda Star Smith.

Jonathan Skrmetti, Attorney General and Reporter; Park Huff, Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Ritchie D. Collins and Cecil C. Mills, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

In March 2017, a Greene County grand jury indicted Petitioner for the first degree murder of Jessie Morrison and of the unborn child of Jessie Morrison. *State v. Smith*, No.

E2019-00968-CCA-R3-CD, 2021 WL 714650, at *1 (Tenn. Crim. App. Feb. 24, 2021). A local resident found Ms. Morrison's body in a remote area of Greene County on August 12, 2016. *Id.* Petitioner is the paternal grandmother of one of Ms. Morrison's two living children. *Id.*

*Trial*

Ms. Morrison's sister, Cheyenne Morrison[1], testified that on August 12, 2016, she was expecting a call from Ms. Morrison after her son's oral surgery, but Ms. Morrison never called or sent a text message. *Id.* Around 7:30 p.m. that evening, Cheyenne and her father went to Ms. Morrison's house to check on her. *Id.* Ms. Morrison's fiancé, Gary Ealey, was at the house, but neither Ms. Morrison nor her children were there. *Id.* Cheyenne called Petitioner's cell phone around 7:40 p.m., but Petitioner did not answer; when she called a second time, Petitioner answered. *Id.* When asked about the whereabouts of Ms. Morrison and her children, Petitioner said she had dropped off Ms. Morrison and the children at their house earlier and did not know where they were. *Id.*

Ms. Morrison's mother, Tammy Morrison, testified that she had received a text message from Ms. Morrison shortly before noon while Ms. Morrison was still at the hospital for her son's oral surgery. *Id.* Tammy had planned to spend the night at Ms. Morrison's house to help care for Ms. Morrison's son after his surgery; Tammy waited at home that evening but never heard from Ms. Morrison. *Id.* Tammy went to Ms. Morrison's house around 9:00 p.m. *Id.* When she arrived, she saw groceries sitting on the floor, the counter, and the stove in the kitchen, and Mr. Ealey was in the living room working on a motor. *Id.* Tammy asked Mr. Ealey if he had seen Ms. Morrison, and he replied that he had hoped Ms. Morrison had been with her. *Id.* Tammy then called Petitioner "to see where [Ms. Morrison] was," but Petitioner did not answer. *Id.*

Because they knew Petitioner was the last person to see Ms. Morrison, Tammy and Mr. Ealey went to Petitioner's house around 10:00 to 10:30 p.m. *Id.* When they arrived, Petitioner's car was "backed up on a hill past her house a little bit," instead of where it was usually parked. *Id.* Petitioner initially did not answer the door when Tammy knocked, but after Tammy continued to "beat" on the door, Petitioner opened it. *Id.* Petitioner's husband, granddaughter, and Ms. Morrison's children were at Petitioner's house. *Id.* When Tammy asked Petitioner where Ms. Morrison was, Petitioner stated she "dropped her off hours ago." *Id.*

---

[1] Because the victim, her sister, and her mother have the same surname, we will refer to the victim as Ms. Morrison and will refer to her sister and mother by their first names. No disrespect is intended.

- 2 -

Around 11:45 p.m., Tammy and Mr. Ealey went to the Greene County Sheriff's Department ("GCSD") to file a missing person's report. *Id.* at *3. A deputy took statements from them but told them it was too early to file a missing person's report. *Id.* Unbeknownst to Tammy, law enforcement officers had already discovered Ms. Morrison's body; however, they had not been able to identify Ms. Morrison until Tammy described Ms. Morrison's tattoos in her statement. *Id.*

GCSD Deputy Daniel Ricker was a detective at the time of Ms. Morrison's death and responded to the scene where her body was found around 9:30 p.m. on August 12, 2016. *Id.* He described the area as "very rural" with surrounding hills, creeks, and woods and noted it was about four to five miles from Petitioner's house. *Id.* Deputy Ricker said Ms. Morrison appeared to have suffered significant head trauma and had reddish-brown stains on her clothing. *Id.*

After learning Petitioner was the last person seen with Ms. Morrison, Deputy Ricker went to Petitioner's house in the early morning hours of August 13. *Id.* Petitioner allowed him to come inside, was cooperative, and consented to a search of her house. *Id.* Petitioner told Deputy Ricker she had last seen Ms. Morrison in the evening on August 12, when Ms. Morrison came to Petitioner's workplace with Petitioner's grandson, claiming she "couldn't do anything with" the child and wanting Petitioner to care for him. *Id.* Petitioner gave Ms. Morrison a check to pay for the child's medication and then took Ms. Morrison to buy groceries. *Id.* They dropped the groceries off at Ms. Morrison's house and then went to Petitioner's house, where she gave Ms. Morrison $1,000 cash. *Id.* Ms. Morrison left in Petitioner's car to go pay bills around 4:00 or 5:00 p.m. *Id.* Petitioner said Ms. Morrison returned around 6:00 or 7:00 p.m., left the keys in the car, and was picked up by a tall male with light hair in a white van. *Id.*

Petitioner also consented to a search of her car. *Id.* at *4. She told officers the car smelled like cat urine, and she had attempted to clean it with Clorox earlier in the week. *Id.* She also reported she had placed a cover on the seat when she went to pick up her granddaughter and noted the car had spots in it that had been there when she bought the car. *Id.* In a second interview later at the GCSD, Petitioner gave a consistent statement. However, she said there was no blood in her car when she picked up her granddaughter around 7:00 p.m. on August 12. *Id.* at *5.

TBI Special Agent Forensic Scientist Terra Asbury, an expert in forensic biology, tested presumptive blood stains and other evidence taken from Petitioner's vehicle. *Id.* at *9. Samples from front passenger seat, front passenger interior door jamb, rear passenger floorboard, driver's seat, and passenger visor contained human blood and a DNA profile matching Ms. Morrison's. *Id.* Both a Coke bottle and a Mountain Dew bottle from the passenger floorboard contained a mixture of two DNA profiles, one of which matched the

Petitioner's profile, and the other being male but inconclusive as to further identification. *Id.* at *10. Agent Asbury said a stain on the lid of the Mountain Dew bottle tested presumptively positive for blood and further testing showed it contained a DNA profile which matched Ms. Morrison's profile. *Id.*

Agent Asbury testified that DNA testing of Ms. Morrison's underwear and vaginal swabs revealed YSTR profiles from at least two males, with one profile matching Mr. Ealey and J.D. Ealey, both of whom had the same Y-STR profile because they were father and son. *Id.* A second male contributor was detected but could not be identified, and some results were limited or inconclusive. *Id.* A paper towel recovered in an area near where Ms. Morrison's body was discovered contained blood from an unknown female, excluding Petitioner. *Id.* DNA on Ms. Morrison's driver's license came from at least two people and excluded the Ealeys as well as Ms. Morrison's and Petitioner's male family members who had provided samples. *Id.* Agent Asbury explained that she performed more than 400 tests and did not examine certain items because additional testing was not scientifically reasonable. *Id.* Fingernail clippings from both of Ms. Morrison's hands contained mixed DNA profiles from multiple males, but the profiles were too limited to identify any contributor. *Id.*

Sharon Burgner, who was the other grandmother of Petitioner's granddaughter, testified that Petitioner came to her house around 7:00 p.m. on August 12 to pick up the granddaughter. *Id.* at *12. Ms. Burgner said she and Petitioner spoke outside of Petitioner's car and she had been on both sides of the car and had seen inside the car that evening. *Id.* at *12-13. Ms. Burgner was shown a photograph of the inside of Petitioner's car taken when officers processed the car, and she said the stains visible in the photograph were not present when she saw Petitioner on the evening of August 12. *Id.*

Jason Matthews testified that he lived near Ms. Morrison's neighborhood. Around 5:00 p.m. on August 12, 2016, he was outside his house and saw Ms. Morrison pull up in a car. About thirty minutes later, he saw her get into a white van and leave. He could not see who was driving the van but said "it looked like a man." On rebuttal, Mr. Matthews was questioned about a second statement he gave to police in 2017, in which he said he was not sure it was Ms. Morrison he saw get into a white van. He said, "I wasn't sure it was [Ms. Morrison] . . . I just seen the back of her hair because I know she had long hair but I didn't see her face." During his testimony, Mr. Matthews acknowledged he had memory problems, was very hard of hearing, and had difficulty understanding people. *Id.* at *12.

The jury found Petitioner guilty of first degree premeditated murder of Ms. Morrison and guilty of the lesser-included offense of second degree murder of Ms.

Morrison's unborn child.  *Id.* at *13.  The trial court sentenced Petitioner to life for the first degree murder conviction and a concurrent sentence of twenty-five years as a Range I offender for the second degree murder conviction.  *Id.*  On appeal, this court affirmed the judgments of the trial court, *Id.* at *1, and our supreme court denied Petitioner's Rule 11 application.  (Tenn. June 9, 2021).

*Post-Conviction Proceedings*

Petitioner filed a timely petition for post-conviction relief alleging that her convictions resulted from a *Brady*[2] violation and ineffective assistance of counsel.  An evidentiary hearing was held on March 28, 2025, at which Petitioner appeared via Zoom, having declined transportation from the correctional facility.

At the hearing, Petitioner presented testimony from Agent Asbury and from trial counsel.  Agent Asbury, who was still a forensic scientist with the TBI, recalled that Ms. Morrison had DNA under her fingernails.  Preliminary testing of that DNA excluded the males in Petitioner's and Ms. Morrison's families; however, she requested additional Y-STR testing which produced a profile consistent with a mixture of at least three males, with a major contributor designated "unknown male #2."  Because the major contributor's profile matched all but one locus with a profile from at least one of the tested males, it was "possible" that the contributor belonged to the same paternal line, although she emphasized the assumption could not be confirmed and could not be formally reported in TBI results.  Agent Asbury testified that she reviewed the DNA testing and results with Petitioner's trial counsel before trial.  She did not recall communicating her assumption directly with trial counsel nor did trial counsel ask her about it.  Post-trial testing excluded another of Petitioner's sons.

Trial counsel testified that he met frequently with Petitioner, interviewed witnesses, and filed multiple pretrial motions, including motions for discovery, a motion in limine addressing the exhibit notebook, a motion for a bill of particulars, and a motion for a material witness bond.  Trial counsel interviewed Agent Asbury before trial and believed he understood the State's DNA results; because Petitioner's DNA was not found under Ms. Morrison's fingernails, he did not consider a defense DNA expert necessary.  He testified that even had he known of Agent Asbury's paternal-line assumption, he did not believe additional testing would have changed his trial strategy, as all individuals he considered potential suspects had already been tested.

Regarding the ineffective-assistance allegations, trial counsel acknowledged that he did not contemporaneously object when the trial court made a comment and laughed

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

during witness Jason Matthews's testimony. He testified that his decision not to object stemmed from his trial strategy and his observations of the jury. He further explained that he did not contemporaneously object to the State's use of Mr. Matthews's second police statement because he believed the State had provided the statement in compliance with Rule 26.2. Trial counsel noted he was unaware of the second statement before trial and Mr. Matthews had been a difficult witness who had recanted several aspects of his initial statement. Trial counsel also testified that he interviewed Petitioner's granddaughter but decided not to call her at trial because he believed her testimony would not withstand cross-examination; he said he discussed the issue with Petitioner, who ultimately made the decision not to call her granddaughter as a witness.

Petitioner testified that she believed the DNA results exonerated her and suggested additional relatives of her husband as potential contributors.

In a written order denying relief, the post-conviction court found that Petitioner failed to establish a *Brady* violation. The court determined that the defense received the relevant DNA reports, Agent Asbury was available to be questioned and was, in fact, called at a pretrial hearing, no evidence showed the State suppressed any information, and Agent Asbury's testimony regarding a possible familial relationship was speculative, unconfirmed, and not material. The post-conviction court noted "[s]ome possibility in the evidence that cannot be confirmed would not create a different result in the verdict."

The post-conviction court also denied relief on the ineffective-assistance claims, finding trial counsel was an experienced attorney who investigated the case, filed appropriate motions, consulted Petitioner regarding witness decisions, and made tactical choices entitled to deference. The court credited trial counsel's explanations regarding his trial decisions, found no deficiency in his failure to object to the trial court's comment or to the admission of the second police statement, and concluded that Petitioner's challenges amounted to hindsight criticisms. The post-conviction court had served as the trial court and noted in its order that it did not remember laughing during Mr. Matthews's testimony but it was "possible the Judge laughed spontaneously." However, the court also noted that it instructed the jury that its instructions, rulings and remarks were not to be viewed as any opinion as to the facts or as what their verdict should be. The court additionally found the decision not to call Petitioner's granddaughter was made jointly by trial counsel and Petitioner. The court held that Petitioner failed to establish deficient performance or prejudice under *Strickland*[3] and denied the petition.

This appeal followed.

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

**Analysis**

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. As such, "[t]he deprivation of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act." *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020) (quoting *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016)).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings. *Dellinger*, 279 S.W.3d at 294. The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness. *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011).

## I. *Brady* Violation

Petitioner first contends the post-conviction court erred in denying relief on the basis of an alleged *Brady* violation and that such error violated her due process rights under both the Constitution of Tennessee and the Constitution of the United States. She argues the State failed to disclose Agent Asbury's pretrial assumption that the DNA from an unidentified major Y-STR contributor found under Ms. Morrison's fingernails was "possibly related" to one of Petitioner's tested male family members. Petitioner maintains this assumption constituted favorable, material evidence and should have been disclosed before trial. The State responds that no *Brady* violation occurred because the information was neither suppressed nor material.

The Due Process Clause of the Fourteenth Amendment and article I, section 8 of the Tennessee Constitution guarantee every criminal defendant a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As part of that guarantee, the State has an obligation to provide the defense with evidence that tends to exculpate the accused or mitigate potential punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Under *Brady*, the prosecution violates due process when it suppresses evidence favorable to the defendant that is material to guilt or punishment, regardless of the State's good or bad faith. *Id.* Tennessee courts have recognized that this duty is broad; it covers all favorable information, even information that may ultimately be inadmissible at trial. *State v. Marshall*, 845 S.W.2d 228, 232–33 (Tenn. Crim. App. 1992). At the same time, the State is not required to disclose information already known or accessible to the defendant, nor information outside the State's possession or control. *Id.* at 233.

Here, to establish a *Brady* violation, Petitioner must show: (1) the defense requested the information (unless it was clearly exculpatory); (2) the State suppressed the information; (3) the information was favorable to the defense; and (4) the information was material. *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995). Petitioner bears the burden of proving these elements by a preponderance of the evidence. *State v. Dotson*, 450 S.W.3d 1, 94 (Tenn. 2014) (citing Edgin, 902 S.W.2d at 389).

"Favorable" evidence includes not only traditional exculpatory proof but also information that could be used to impeach the State's witnesses. *Johnson*, 38 S.W.3d at 55–56. Evidence is favorable if it offers meaningful assistance to the defense, for example, by corroborating the defendant's account, undermining a material aspect of the State's proof, or challenging the credibility of a key witness. *Id.* at 56–57 (citing *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)). In *Johnson*, our supreme court also cited with approval the view that evidence is favorable if it provides grounds to question the reliability or thoroughness of the police investigation or otherwise strengthens the defense against prosecutorial attacks. *Id.* (citing *Mazzan v. Warden*, 993 P.2d 25, 37 (Nev. 2000)).

Evidence is "material" if there is a reasonable probability its disclosure would have changed the result of the proceedings. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

On appeal, a trial court's findings of fact concerning issues such as whether the defendant requested the information or whether the State withheld it are reviewed de

novo with a presumption of correctness unless the evidence preponderates otherwise. *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). Conclusions of law, such as whether the information was favorable or material, are reviewed de novo with no presumption of correctness. *Id.*

Here, the post-conviction court found Petitioner did not satisfy any of the *Brady* requirements. The court credited evidence showing the defense received the relevant DNA reports before trial and Agent Asbury was available to be questioned. The court also found Petitioner's counsel had, in fact, called Asbury during a pretrial hearing and had the opportunity to inquire about any concerns regarding possible familial relationships reflected in the Y-STR results. The post-conviction court concluded the State had not suppressed any information. Further, the court found Agent Asbury's testimony describing only a "possibility" of a paternal-line connection, which could not be confirmed or reported, was not favorable within the meaning of *Brady* because it did not provide significant aid to the defense. Finally, because the paternal-line assumption was speculative and unverifiable, the post-conviction court held that Petitioner failed to establish materiality.

The record does not preponderate against the post-conviction court's determination. Petitioner had access to the DNA reports, and Agent Asbury testified that she did not expressly discuss her assumption with trial counsel simply because she "wasn't asked," not because the State suppressed the information. Moreover, she was clear that because the assumption could not be confirmed, it could not be included in her written report. Nothing in the record suggests disclosure of this unconfirmed possibility would have altered the investigation or the outcome of trial, particularly since the jury already heard that Petitioner's DNA was not found under Ms. Morrison's fingernails. Petitioner is not entitled to relief.

## II. Ineffective Assistance of Counsel

Petitioner next argues trial counsel rendered ineffective assistance by (1) failing to hire a DNA expert; (2) failing to contemporaneously object when the trial court made a comment and laughed during Mr. Matthews's testimony; (3) failing to contemporaneously object to the State's use of Mr. Matthews's second, undisclosed police statement; and (4) failing to call a corroborating witness. The State maintains counsel acted within the bounds of reasonable professional judgment and Petitioner failed to show any resulting prejudice.

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this Court reviews de novo." *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger*, 279 S.W.3d at 294). However, the post-conviction

- 9 -

court's factual findings are conclusive on appeal unless evidence preponderates against them. *Howard*, 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State*, 40 S.W.3d 450, 456, n.4 (Tenn. 2001). Accordingly, as an appellate court, we are not to re-weigh or re-evaluate the evidence or substitute our inferences for those drawn by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). In general, we defer to a post-conviction court's findings concerning witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015); *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick*, 454 S.W.3d at 457. Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick*, 454 S.W.3d at 457 (quoting *Strickland*, 466 U.S. at 688); *see also Baxter v. Rose*, 523 S.W.2d 930, 932-33 (Tenn. 1975). A defendant asserting ineffective representation must overcome the strong presumption that counsel exercised reasonable judgment in all significant decisions. *Strickland*, 466 U.S. at 687-89; *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013); *Kendrick*, 454 S.W.3d at 458; *Nesbit v. State*, 452 S.W.3d 779, 788 (Tenn. 2014).

Review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006). Deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Kendrick*, 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick*, 454 S.W.3d at 458 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit*, 452 S.W.3d at 786-87. Accordingly, if either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the fact of counsel's alleged error by clear and convincing evidence." *Phillips*, 647 S.W.3d at 401 (quoting *Dellinger*, 279 S.W.3d at 294); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1).

## Failure to Hire a DNA Expert

Petitioner asserts that trial counsel was ineffective for not hiring a DNA expert who could have identified or emphasized the potential paternal-line relationship suggested by the Y-STR results. However, trial counsel testified that he did not believe an expert was necessary because the DNA under Ms. Morrison's fingernails did not belong to Petitioner. Trial counsel spoke with Agent Asbury before trial, understood the State's conclusions excluding Petitioner and her immediate family, and believed the existing DNA evidence already supported the defense theory. Trial counsel also explained he did not know of any other people who could reasonably be tested. The post-conviction court accredited trial counsel's testimony and found that his decision was a reasonable strategic choice based on the information available at the time.

Petitioner also failed to present an expert witness at the post-conviction hearing to explain what additional analysis would have shown. When a petitioner faults counsel for failing to call a witness or failing to consult or present an expert, the petitioner must present that witness at the post-conviction hearing to establish both deficiency and prejudice. *See Black v. State*, 794 S.W.2d 752, 757–58 (Tenn. Crim. App. 1990); *Brown v. State*, No. W2021-01331-CCA-R3-PC, 2022 WL 16919956, at *8 (Tenn. Crim. App. Nov. 14, 2022); *Britt v. State*, No. W2016-00928-CCA-R3-PC, 2017 WL 1508186, at *7 (Tenn. Crim. App. Apr. 25, 2017). Neither a trial court nor an appellate court may guess what a witness or expert might have said. *See also Brimmer v. State*, 29 S.W.3d 497, 512 (Tenn. Crim. App. 1998) ("[T]here can be no speculation as to what the [expert] evidence 'would have shown and . . . how it would have benefitted' [Petitioner].") (quoting *Davis v. State*, 912 S.W.2d 689, 698 (Tenn. 1995)). When a petitioner presents no witness or expert at the hearing, she ordinarily fails to establish prejudice. *Black*, 794 S.W.2d at 757.

The record does not preponderate against the post-conviction court's findings. Petitioner has failed to demonstrate either deficient performance or resulting prejudice with respect to this claim and is not entitled to relief.

**Failure to Object to the Trial Court's Comment**

Petitioner next asserts that trial counsel performed deficiently by failing to object when the trial court made a brief comment and laughed during Mr. Matthews's testimony. Petitioner has failed to cite to the comment he complains the trial judge made, and the record does not reflect an inappropriate comment or laughter by the trial court. In any event, trial counsel testified that he considered objecting but ultimately made a strategic decision not to do so based on his real-time assessment of the jury's demeanor and his belief that an objection would only highlight the exchange. The post-conviction court credited this explanation and viewed trial counsel's decision as a tactical judgment made in the moment. Under *Strickland*, courts must avoid "the distorting effects of hindsight" and instead evaluate counsel's conduct from counsel's perspective at the time. 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. Petitioner has not shown that trial counsel's decision was anything other than a tactical choice entitled to deference. *See Granderson*, 197 S.W.3d at 790.

Petitioner also fails to carry her burden on the prejudice prong. Tennessee law places the burden squarely on a post-conviction petitioner to present evidence showing how counsel's alleged error affected the outcome. *See* T.C.A. § 40-30-110(f). Here, as noted above, Petitioner does not cite to the specific comment nor has she offered any proof suggesting the trial court's actions influenced the verdict. Further, Petitioner has not offered any evidence that counsel's objection would have prompted a curative instruction different from the one the trial court ultimately provided. The court instructed the jury that no remarks from the bench should be construed as commentary on the evidence, and juries are presumed to follow such instructions. *State v. Harbison*, 539 S.W.3d 149, 163 (Tenn. 2018). Without proof to the contrary, Petitioner cannot demonstrate the isolated moment had any meaningful effect on the proceedings.

The record does not preponderate against the post-conviction court's findings. Petitioner has failed to demonstrate either deficient performance or resulting prejudice with respect to this claim and is not entitled to relief.

**Failure to Object to the Admission of Mr. Matthews's Second Statement**

Petitioner also contends trial counsel performed deficiently by failing to object when the State used Mr. Matthews's second police statement, which she alleges was not disclosed before trial, to impeach him. At the post-conviction hearing, trial counsel testified that he believed the State complied with Rule 26.2 by providing the statement during Mr. Matthews's testimony, as the rule requires. *See* Tenn. R. Crim. P. 26.2. He further explained that, based on his experience and observations during the trial, he did not believe an objection would have been successful. The post-conviction court credited

this testimony and concluded that counsel made a reasonable strategic decision under the circumstances. Nothing in the record preponderates against that finding. Petitioner offered no evidence suggesting that an objection would have excluded the statement, altered the way Mr. Matthews was impeached, or changed the jury's evaluation of his credibility.

Under *Strickland*, strategic decisions, particularly those made in real time, are entitled to substantial deference when grounded in informed judgment. 466 U.S. at 689–91. A reviewing court may not "second-guess" trial counsel's considered tactical choices merely because a different lawyer might have attempted a different approach. *Id.*; *see also Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Here, the record does not support the notion that trial counsel's assessment was uninformed or unreasonable.

Moreover, Petitioner has not shown prejudice. At the post-conviction hearing, she presented no testimony from Mr. Matthews to establish how the impeachment affected his credibility at trial, how he would have responded if counsel had objected, or whether his overall testimony would have changed in any meaningful way. Tennessee courts have consistently held that when a petitioner challenges trial counsel's handling of a witness, including impeachment, rehabilitation, or failure to object, the petitioner must present that witness at the post-conviction hearing. Without the witness, a court has no basis to evaluate what difference, if any, the alleged error made. *See Black*, 794 S.W.2d at 757-58; *Brown*, 2022 WL 16919956, at *8; *Britt*, 2017 WL 1508186, at *7.

The record does not preponderate against the post-conviction court's findings. Petitioner has failed to demonstrate either deficient performance or resulting prejudice with respect to this claim and is not entitled to relief.

**Failure to Call a Witness**

Finally, Petitioner argues trial counsel performed deficiently by failing to call a witness, who she asserts could have corroborated testimony that no blood was present in Petitioner's car earlier in the evening on August 12. Trial counsel, however, testified that he interviewed the witness before trial, questioned whether her testimony would hold up under cross-examination, particularly regarding timing and the later discovery of the body, and discussed the matter with Petitioner, who ultimately agreed not to call the witness. The post-conviction court credited counsel's testimony and concluded the decision not to call the witness was a strategic one.

"[T]he decision to call, or not call, certain witnesses is clearly a strategic and tactical decision, and such decisions are not to be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). Such decisions are "virtually

- 13 -

unchallengeable" when based on adequate investigation. *Strickland*, 466 U.S. at 690–91. Counsel's testimony reflects precisely such an informed, pretrial investigation. Petitioner has not shown otherwise.

Further, Petitioner cannot establish prejudice because the witness did not testify at the post-conviction hearing. This is fatal to her claim. As stated above, Tennessee courts consistently hold that when a petitioner claims counsel was ineffective for failing to call a witness, the petitioner must produce that witness at the evidentiary hearing so that the court can evaluate the substance and significance of the omitted testimony. *Black*, 794 S.W.2d at 757; *Brown*, 2022 WL 16919956, at *8; *Britt*, 2017 WL 1508186, at *7. Courts cannot speculate about what the witness might have said or how persuasive the testimony might have been. *Brimmer*, 29 S.W.3d at 512. The record contains no evidence of what the testimony of the witness would have been, how it would have withstood cross-examination, or whether it would have influenced the jury's determination. Without such evidence, Petitioner cannot show that trial counsel's decision prejudiced the defense or undermined confidence in the outcome. *Black*, 794 S.W.2d at 757.

The record does not preponderate against the post-conviction court's findings. Petitioner has failed to demonstrate either deficient performance or resulting prejudice with respect to this claim and is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgments of the post-conviction court are affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 14 -